**UNITED STATES OF AMERICA**

v.

**Carlos Humberto RUIZ, Defendant.**

**No. 01 CR.864 GEL.**

United States District Court,
S.D. New York.

Nov. 27, 2002.

David M. Rody, Assistant United States Attorney, New York, New York (James B. Comey, United States Attorney for the Southern District of New York), for United States of America, of counsel.

Martin Klotz, New York, New York, for Defendant Carlos Humberto Ruiz.

## SENTENCING OPINION

LYNCH, District Judge.

Carlos Humberto Ruiz stands before the Court for sentencing after conviction by a jury of two counts charging him with conspiring to import the controlled substance methylenedioxy-methamphetamine (commonly known as "MDMA" or "ecstasy") in violation of 21 U.S.C. § 963, and to distribute the same drug in violation of 21 U.S.C.

§ 846. The Probation Department calculated his guideline sentencing range at 235 to 293 months, based on a criminal history category of I (the 30–year old Ruiz, an American citizen who has lived much of his life in Colombia, has no known criminal record in either country) and a base offense level of 38 (resulting from the enormous amount of MDMA in the shipment Ruiz was to have picked up in New York– over 300,000 pills, which the evidence showed could be sold at retail in New York for more than $6,000,000, and which the Sentencing Commission treats as the equivalent of more than 37,000 kilograms of marijuana [1]).

Ruiz disputes this calculation, arguing that he should be credited with a four-level downward adjustment as a minimal participant in the offense, or, failing that, a two-level adjustment as a minor participant, pursuant to U.S.S.G. § 3B1.2. A recent guideline amendment, however, dramatically increases the consequences of the reduction in the circumstances of this case. Under the newly-added U.S.S.G. § 2D1.1(a)(3), the offense level for a defendant who receives *any* mitigating role adjustment is capped at 30. See United States Sentencing Guidelines, Supplement to Appendix C, Amendment 640 (effective November 1, 2002) ("Amendment 640"). Moreover, this reduction refers to the *base* offense level; after determining this level, the reduction for mitigating role is then applied, further reducing the total offense level to 28 in the case of a minor participant. U.S.S.G. § 3B1.2, Application Note 6. For a first offender like Ruiz, this calculation results in a sentencing range of 78– 97 months. Thus, assuming there are no grounds for upward or downward depar-

ture from the recommended sentencing range (and neither party has suggested that any exists), if Ruiz qualifies for the minor participant adjustment, the *longest* sentence he can receive is about eight years, while if that adjustment is inapplicable, the *shortest* sentence allowable is just under twenty years. Because the effect of the adjustment is so dramatic under the circumstances of this case, it seems advisable to set forth the basis of the Court's conclusions, for the benefit of the parties and of the Court of Appeals, should the sentence be appealed.

## FINDINGS OF FACT

The case was tried before this Court and a jury, and neither party has asked for a hearing to present additional evidence. Accordingly, the Court has a full picture of the evidence available concerning the nature of the conspiracy and Ruiz's role in it. Even so, as is not unusual given the furtive nature of such illegal enterprises, details of the conspiracy's extent and of Ruiz's true level of involvement are shadowy, and the available evidence is limited by the degree to which law enforcement officers have been able to penetrate the criminal group. Since, as will be seen, Ruiz appeared for the first time at the very end of a lengthy undercover operation, much about his role remains obscure.

The evidence at trial showed that the joint efforts of Dutch, German and American law enforcement agencies succeeded in uncovering an organization, composed primarily of Columbian nationals, that manufactured the drug ecstasy in the Netherlands (the principal source country for this drug) and exported it to the United States. Beginning in the spring of 2001, a skillful

---

**1.** The Probation Department erroneously states the marijuana equivalency as 37,625,-000 *kilograms* of marijuana, rather than that many *grams*, but the error is immaterial; any-

thing over 30,000 kilos places an offender at level 38, the highest drug quantity offense level.

German undercover officer convinced the key conspirators in the Netherlands, Jose Valderama Ruiz (no relation to the defendant) and Beatriz Henao, that he could securely transport huge quantities of pills from Europe to the United States. He persuaded the conspirators to entrust him with large amounts of illegal drugs without his paying for them, and even to pay him for the privilege of handing their illegal products over to the authorities.

The conspirators decided to try an initial test run of 47,000 pills before making the major shipment that led to the arrest of Ruiz. From the criminals' perspective, the test went off almost without a hitch: The pills were delivered undetected (so far as they knew) to their courier in New York. Through a ruse that will not be described here, the investigators, by making it appear that the drugs were discovered inadvertently after the delivery had been successfully made, were able to arrest the courier and seize the drugs without bringing the undercover officer under suspicion. Writing that seizure off to bad luck and the incompetence of their New York courier, the leaders of the enterprise decided to go ahead with a larger shipment.

The undercover was provided with 301,-000 pills in Germany to be transported to the United States, and instructed to contact a representative of the conspiracy in New York, who would arrange for the pills to be delivered to a Florida-based organization for distribution. On September 29, 2001, upon his arrival in New York, the undercover officer contacted the mobile telephone number he had been given, and spoke to an individual who arranged a meeting in Manhattan on October 1. That individual, who was known to the undercover as "Lelo," turned out to be a man Ruiz (who does not speak English) had recruited in New York to serve as his translator, in place of the person originally assigned to play this role. Prosecutors ultimately decided not to charge the translator with any crime.

The movements of the players can be tracked with considerable certainty from this point on. The undercover team (the German officer and a DEA agent who accompanied him to meetings posing as a Russian organized crime figure) recorded their calls to "Lelo" and their meetings with Ruiz, while the Dutch authorities, through court-authorized wiretaps on the phones of the leaders of the conspiracy in Europe, monitored Ruiz's calls to the Netherlands for instructions.

On October 1, the agents met with Ruiz and his translator. Peculiarly, given that the huge number of pills weighed over 150 pounds packed in four large duffel bags, Ruiz arrived without a car, and asked to borrow the agents' vehicle to transport the drugs to their next destination. The agents initially resisted lending their car to Ruiz, and asked for payment of the $140,000 allegedly due for transporting the pills. Ruiz balked, claiming that he had no money, knew of no payment due, and would have to check with his superiors to find out what was going on. When the agents, after some negotiations, agreed to deliver the drugs and lend the car without getting paid, Ruiz became suspicious of this apparently un-drug-dealer-like generosity, ended the meeting, and proposed meeting the next day to take delivery and exchange any money at the same time. The agents advised Ruiz to call Henao in the Netherlands for instructions about whether and how to take delivery of the drugs and pay the undercover for his services.

As disclosed by the fruits of the Dutch wiretap, Ruiz did just that. Ruiz called Henao and reported the events of the day, discussing his suspicions and the apparent confusion over payment. In the conversa-

tion, Henao treated Ruiz with apparent familiarity and some respect, but is without question the decision-maker. Henao approved a meeting with the agents the following day. When Ruiz and "Lelo" met with the agents on October 2, they were arrested. The leaders of the conspiracy were arrested in the Netherlands at about the same time. Unfortunately, they were released on bail and fled, and most remain at large.

There is little reliable evidence of Ruiz's activities before this transaction. During his meetings with the agents, Ruiz disclosed that he had been recruited for this mission about six weeks earlier in Colombia by a man named "Mike" who was his connection to Valderama Ruiz. Grand jury testimony confirms that government agents had no information linking Ruiz to the other conspirators before this time. Other references in the various taped conversations show that Ruiz was aware of the people in Florida who the undercover had been told were to distribute the drugs, and that he was in frequent contact with Henao. Documentary evidence indicates that Ruiz traveled from Colombia to New York via Ecuador and Florida. Ruiz's statements and documents in his possession indicate that Ruiz was sent only small sums of money to support himself in New York; moreover, he told the Probation Department that he worked as a building cleaner near the World Trade Center site for $8.25 per hour while waiting for the undercover to arrive in New York with the drugs.[2]

## DISCUSSION

█ Ruiz argues that he should be credited with a minor or minimal role in the offense. In support of this claim, he contends that he joined the conspiracy relatively late, that he was involved in the receipt of only this one shipment of drugs, that his role with respect to the shipment was only to accept delivery and almost immediately pass the drugs on to the true consignees for further distribution, that he had no access to significant sums of money, that he acted in a subordinate role and could not make decisions without approval from his bosses, and that, as suggested by various pieces of evidence (such as his failure to arrange adequate transportation for the quantity of drugs involved), he had only a vague idea of the size of the shipment and was not even told how much he would be paid for his services. He stresses that as compared with the other members of the conspiracy referred to in the indictment and during the trial, he was clearly the least culpable (with the exception of the hapless recipient of the first shipment and the translator "Lelo," who was considered unworthy of prosecution at all). The government, in contrast, points out that Ruiz appears to have been on friendly terms with Henao, who it regards as the head of the organization, that the undercover was told that the recipient of this shipment (in contrast to his predecessor) would be someone experienced in the drug trade, and that Ruiz exercised independent judgment in refusing to take delivery on October 1 due to his suspicions of the agents. The government also emphasizes that Ruiz was entrusted with tasks critical to the success of a scheme to import illegal drugs worth some $6,000,000. Finally, both parties draw inferences from what they suggest are the standard practices of drug organizations, Ruiz arguing that drug dealers would use a flunky rath-

---

**2.** No independent evidence confirms this statement, but the government does not dispute it, despite having interviewed the translator, who appears to have been in a position to confirm or deny the claim. Under the circumstances, the Court credits the statement, as apparently did the Probation Department.

er than risk an important operative at the most vulnerable point of the importation, and the government countering that drug dealers would not allow a mere flunky to have potentially compromising contact with the organization's kingpin.

For the most part, these arguments are all factually sound, and firmly grounded in the evidence. Only one argument can be rejected out of hand. Second Circuit case law makes clear that "a minor role adjustment is not available merely on a showing that the defendant 'played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be "minor" ... as compared to the average participant in such a crime.'" *United States v. Kwok Ching Yu,* 285 F.3d 192, 200 (2d Cir.2002) (quoting *United States v. Rahman,* 189 F.3d 88, 159 (2d Cir.1999)). See U.S.S.G. § 3B1.2, Application Note 3(A) (mitigating role adjustments apply to defendants who are "substantially less culpable than the average participant"). Thus, to the extent that Ruiz claims that he should be regarded as a *minor participant* solely because he played a markedly lesser role in the conspiracy than the other identified players, such as the manufacturers in the Netherlands or the distributers in Florida, the claim must be rejected.

The standard of the "average participant in such a crime" is not especially helpful. Large drug conspiracies may involve an extensive, vertically integrated network of manufacturers, packagers, couriers, enforcers, airplane pilots and ships' crews, wholesalers, retailers, laborers, drivers and look-outs, engaged in repeated transactions over a substantial period of time. It may be clear that the "kingpin" of such an organization is something much more than an "average" participant and that a laborer engaged on a single occasion to load a ship or plane is something less, but

one cannot easily take an "average" of the roles of so many diverse participants.

For this reason, the Court of Appeals has also repeatedly emphasized that the "assessment of the defendant's role in criminal activity is highly fact-specific." *United States v. Shonubi,* 998 F.2d 84, 90 (2d Cir.1993), *quoted in United States v. Carpenter,* 252 F.3d 230, 234 (2d Cir.2001). Among the variety of factors to be considered are "the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *Shonubi,* 998 F.2d at 90. Moreover, there is no talismanic set of role definitions that will entitle or disentitle a defendant to be considered a minor participant in a narcotics conspiracy. For example, the Court of Appeals has emphatically rejected the idea that a drug "courier" is "automatically entitled to a § 3B1.2 minor role adjustment based on that status." *United States v. Garcia,* 920 F.2d 153, 155 (2d Cir.1990). But while a courier is not automatically a minor participant, the Court made clear in *Garcia* that "in certain cases and on particular facts," a courier may well be eligible for a downward adjustment. *Id.* Other circuits agree. *United States v. Harfst,* 168 F.3d 398, 403 (10th Cir.1999); *United States v. Isaza–Zapata,* 148 F.3d 236, 239 (3d Cir.1998). Eligibility for the adjustment "does not turn solely upon [a defendant's] status or his assigned task in the criminal enterprise." *Garcia,* 920 F.2d at 155.

Similarly, in *United States v. Colon,* 884 F.2d 1550, 1552 (2d Cir.1989), the Court ruled that a "steerer"–defined in *United States v. Neils,* 156 F.3d 382, 383 (2d Cir. 1998) as "a go-between who steers customers to the supplier" in street sales of small quantities of drugs– "play[s] an important role in street-level drug transactions, di-

recting buyers to sellers in circumstances in which the sellers attempt to conceal themselves from casual observation" and affirmed a district court's refusal to consider the steerer a minimal participant. In *United States v. LaValley*, 999 F.2d 663, 666 (2d Cir.1993), however, the Court held that it could not be stated categorically that steerers may never receive a minor participant reduction. And in *Neils*, the Court, though noting that "in a typical street-level drug transaction, a 'steerer' will normally not be so minimally involved as to be entitled to downward adjustment," held that the sentencing court's failure to "make a factual determination as to whether the 'steerer's' role in the crime at hand is 'minor' " was reversible error. 156 F.3d at 384. Thus, even were it possible to classify Ruiz as essentially a drug courier, that conclusion would not dictate the applicability or inapplicability of the adjustment.

■ It is clear from the cases, moreover, that the sentencing court's evaluation of a defendant's role in the offense must to some extent depend on the scope of the criminal activity involved, that is, on "the defendant's culpability in the context of the facts of the case." *Garcia*, 920 F.2d at 155. Thus, while the steerer in *Colon* played an "important role" in a "street-level drug transaction[ ]," someone who committed exactly the same acts would certainly be a minor participant in a conspiracy of the scope of the one at issue here. Judged in comparison to the "average participant" in a single sale of a couple of vials of crack on the street, the steerer is fairly held accountable at the offense level and corresponding sentence dictated by the quantity of drugs sold. But in the context of a large distribution ring, the steerer, and even the seller to whom he steers the customers, may well be considered mere cogs in a massive enterprise, who should not be punished at the level dictated by the large quantity of drugs for which they could be held accountable if they were generally aware of the scope of the organization.

■ Put another way, in assessing the applicability of a minor role adjustment, a court should not lose sight of the effect of the adjustment on the fairness of the resulting sentence. This is not to say that a court may arbitrarily apply the adjustment in a result-oriented manner, to impose whatever sentence the judge feels is appropriate for a particular offender. It *is* to say, however, that the Sentencing Guidelines strive to create a rational scheme, and that the various offense levels and adjustments are intended to result in a punishment geared to each defendant's culpability. The Commission's decision to increase the punishment in drug cases based on the quantity of drugs imported or distributed makes perfect sense in light of that goal, because large-scale drug dealers are more culpable than small-scale operatives. But by the same token, those distance between the supporting players and the principal offenders can be much greater in a large conspiracy than in a small one. The difference in power and culpability between the one-kilo dealer and his driver is proportionately less than that between the international drug kingpin and his.

The caselaw thus provides some useful instruction in applying the standard of "the average participant in such a crime." First, "such a crime" cannot mean "narcotics conspiracy" in general. The "average narcotics conspirator" is probably a rather low-level dealer. It would make little sense, however, in deciding whether Ruiz's culpability merits an adjustment from the punishment provided for importers of massive quantities of drugs to compare him to the average participant in the far more

numerous conspiracies of local street-level dealers. The appropriate question is whether Ruiz is "substantially less culpable" than the average participant in a conspiracy of the magnitude that determines the base offense level.

Second, in determining the "average" participant in such a conspiracy, the Court must look to the participant whose culpability level is normative (neither enhanced nor mitigated) for the punishment level assigned by the Sentencing Commission to such a crime. In other words, the Court must ask not "what is the most numerous category of participants in such crimes?" but "who is the typical importer of 301,000 ecstasy pills, whom the Sentencing Commission presumably had in mind in deciding that such an offender merits imprisonment for twenty years?" The government rightly points out that in most large drug conspiracies there are even lower-level participants than Ruiz. Such individuals, however, may themselves be minor participants, or may even qualify for a minimal participant adjustment. But surely, in assigning a twenty-year sentence to importers of 300,000 ecstasy pills or the equivalent in other drugs, the Commission was not thinking primarily of the "people who prepare and package the pills," or sell the pills one at a time in dance clubs, to whom the government refers (Letter of AUSA Rody to the Court, dated November 26, 2002, at 3), even if these low-level participants in the conspiracy are rather more numerous than the core conspirators.

The new amendment to the drug guidelines capping the offense level for minor participants represents a recognition that narcotics sentences can be driven to excessive lengths for minor drug offenders by an exclusive emphasis on quantity. As the Commission stated in explaining the purpose of the amendment, the new provision "somewhat limits the sentencing impact of drug quantity for offenders who perform relatively low level trafficking functions, have little authority in the dug trafficking organization, and have a lower degree of individual culpability (*e.g.*, 'mules' or 'couriers' whose most serious trafficking function is transporting drugs and who qualify for a mitigating role adjustment.)" Amendment 640, at 264–65.

A comparison between Ruiz and his predecessor illustrates the point. Both were members of the same conspiracy, and functioned in the same capacity. But because Ruiz met the second shipment rather than the first, his unadjusted sentence range is 235 to 295 months, while his co-conspirator, who met a shipment of 47,000 pills (the "equivalent" of about 6000 kilos of marijuana) would be at offense level 34, resulting in a sentence range of "only" 151–188 months. Even recognizing that the size of the shipment might make some difference to the social harm caused and the likely level of involvement of the functionary trusted to handle the shipment, it is difficult to understand why a difference of seven years in prison should separate the two co-conspirators. Under the former guidelines, the quantity of the shipment with which they were involved had a disproportionate impact on their punishment. Even a mitigating role adjustment, if applicable, would not greatly reduce this unwarranted disparity: Finding these defendants minor or even minimal participants would somewhat reduce the severity of the sentences, but the defendants would still be treated quite differently from each other. Since the sentencing consequences of modest involvement in major criminal schemes can be quite extreme at the higher offense levels, the Commission deliberately decided to increase the importance of the minor offense adjustment to compensate for that distortion. As the Commission put it, the amendment was intended to respond to "concerns that base offense

levels derived from the Drug Quantity Table ... overstate the culpability of certain drug offenders who meet the criteria for a mitigating role adjustment under § 3B1.2." Amendment 640 at 265.

Sensitivity to the special context of large drug operations will not always favor defendants. Ruiz relies heavily on *United States v. Martinez*, Dkt. No. 00 Cr. 1306(RWS), 2002 WL 1041318 (S.D.N.Y. May 22, 2002), in which Judge Sweet found a minor role adjustment appropriate for a drug courier. Recognizing that cases such as *Garcia* hold that a courier is not *necessarily* a minor participant, not that a courier can *never* be a minor participant, Judge Sweet cited five factors that justified the adjustment for Martinez: "(1) [he] did not own the drugs; (2)[he] did not finance any part of the offense; (3)[he] had no decision-making authority in the operation; (4)[he] did not sell the drugs; and (5)[he] had a distinct lack of knowledge or understanding of the scope and structure of the enterprise." 2002 WL 1041318, at *1. Ruiz argues that the same can be said of him.

So far as appears from the opinion, however, Martinez was involved with only a few other co-conspirators in a modest heroin operation. In such an operation, the "average" or normative participant might well be the single entrepreneur who owns, finances and sells the drugs; the hired hand who transports the drugs may thus appear distinctly less culpable than that "average participant." In a conspiracy involving the multinational transportation of millions of dollars worth of drugs, in contrast, the fact that a particular conspirator does not have a financial stake in the venture (the essential point of three of the five factors cited in *Martinez*) seems of much less significance: Most of the many players involved in such an extensive venture will not have an ownership interest. The role feigned by the undercover officer

in this case demonstrates how a "courier" entrusted with such a large and complex drug shipment can be a skilled, highly-paid operative whose efforts may be critical to the success of the venture. While most of the *Martinez* factors apply to someone playing that role, it would be wrong to consider such a highly significant courier a minor participant. In the end, assessing Ruiz's role in the offense requires a specific analysis of his particular role in this particular conspiracy. Mechanically matching the facts of his case against factors that proved determinative in other cases involving conspiracies of an entirely different scope will not dictate the outcome.

The evidence concerning Ruiz's role makes this a close case. That Ruiz was in personal contact with the leadership of the conspiracy and was trusted by the organization to take delivery of such a major shipment precludes a finding that he was a minimal participant in the offense, and argues strongly against finding him a minor participant. On balance, however, I conclude that the minor participant adjustment should apply in this case. There is no evidence that Ruiz was a longstanding member of the conspiracy with a regular role; rather, it appears that he was recruited specifically for the purpose of accepting delivery of this particular shipment of drugs. His responsibility after taking delivery was at most simply to count the pills and then turn them over to the distributors. In effect, he was a buffer hired to engage in the risky business of taking delivery from potentially dangerous outsiders, limiting the exposure of more important members of the conspiracy. Not only did he lack an ownership interest in the drugs, but more importantly, his remuneration was unspecified and clearly extremely modest; important players in multimillion dollar international transactions do not typically occupy their time while waiting

for a significant meeting by working as porters cleaning buildings–particularly in the unpleasant and potentially dangerous environment of downtown Manhattan in September 2001. Ruiz clearly was subordinate to several layers of authority in the organization, and he appears to have known little about the details even of this transaction, let alone of the broader conspiracy.[3] While Valderama Ruiz told the undercover that his people in New York, "Cantorro" and "Lelo," were experienced and trustworthy people, this statement is hardly reliable. It is not certain that Valderama Ruiz knew Ruiz or had any idea who "Cantorro" and "Lelo" would turn out to be: It was "Mike's" responsibility to recruit someone in Colombia to play the role of "Cantorro," and if "Lelo" could be replaced by someone picked up virtually at random, there is no reason to think that "Cantorro" was anything more than a name for whomever "Mike" chose to recruit for a specific and limited role in the transaction.

Ruiz surely cannot be considered a minimal participant; he exercised some discretion in handling his part of the transaction, and was trusted by the conspirators to take possession of millions of dollars worth of drugs. His role was not without significance. But neither was it critical to the success of the enterprise, except in the trivial sense in which every cog in the machine has to play its part in order for the machine to work. Virtually anyone could have been inserted to accept delivery without threatening the success of the enterprise. The government argues that Ruiz's exercise of discretion in carrying out his duties precludes him from receiving a mitigating role adjustment, but this factor is no more controlling than any other single factor. The "discretion" exercised by Ruiz amounted to hiring a translator and postponing a meeting for a day so that he could receive instructions from his superiors about how to proceed. Far from showing his authority in the organization, the latter decision (on which the government principally relies) demonstrates that Ruiz *lacked* the authority to make a decision on his own, and needed to check with his superiors before proceeding further.

In comparison not only to the leaders and organizers of the plot, but even to the "average" members of a multi-million dollar international drug ring, Ruiz was uninformed about the details of the conspiracy, and played a role that was poorly compensated and limited in importance, duration, skill and authority–in a word, minor. He is "substantially less culpable" than the normative multi-million dollar importer of illegal narcotics.

### SENTENCE

Because Ruiz qualifies for a minor participant role adjustment, his base offense level is capped at 30 by U.S.S.G. § 2D1.1(a)(3), minus two levels pursuant to § 3B1.2(b), and his presumptive sentence is between 78 and 97 months. It is appropriate to sentence Ruiz at the high end of the range in order to serve the goal of proportionate, non-disparate punishment for comparably culpable offenders. First, although Ruiz merits consideration as a minor participant, the case is a close one, and he must rank at the high end of the

---

**3.** The government correctly argues that references in the wiretapped conversations with Henao make clear that Ruiz knew that he was to pick up a shipment of pills. But this merely establishes that Ruiz was guilty of the crime charged. It says little about his precise role in the conspiracy or the extent of his knowledge of its details. There is no evidence that he knew how many pills were involved, who the undercover agents were supposed to be or what they were to be paid, or whether there had been or were to be other shipments.

spectrum of defendants who receive a mitigating role adjustment. Thus, the goal of proportionate punishment requires differentiating among conspirators of different levels of mitigating role who are subject to § 2D1.1(a)(3).

Second, the quantity of drugs involved here was very large. A defendant who played a similar role but whose original offense level was only 32 (which could result from a transaction involving fewer than 10,000 pills), rather than the 38 applicable here, would also be placed by § 2D1.1(a)(3) at the same level as Ruiz, but would deserve a lesser punishment. Moreover, most defendants who played comparable roles in comparable conspiracies involving other drugs at equivalent offense levels would face mandatory ten-year sentences. While Congress has chosen not to impose such mandatory sentences in the case of MDMA, in exercising discretion to set a particular sentence within the applicable range, I find it difficult to distinguish Ruiz's culpability from that of many defendants to whom such mandatory minimum sentences apply, or to justify imposing a significantly lower sentence on him than on them.

Given the seriousness of Ruiz's conduct and the scope and harmfulness of the conspiracy he joined, a sentence of 97 months' imprisonment is appropriate.

SO ORDERED.