**UNITED STATES of America**

v.

**Felix PEREZ, Defendant.**

**No. 01 CR. 754(GEL).**

United States District Court,
S.D. New York.

May 5, 2003.

Preetinder Bharara, Assistant United States Attorney, New York, New York (James B. Comey, United States Attorney for the Southern District of New York), for United States of America, of counsel.

B. Alan Seidler, Nyack, New York, for Defendant Felix Perez.

## SENTENCING OPINION

LYNCH, District Judge.

Felix Perez, a 23–year old man with no prior criminal convictions, stands before the Court for sentencing, following his plea of guilty to one count of conspiracy to distribute more than 50 grams of crack, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The case presents another variation on the difficult sentencing issues presented by the interaction among the extremely severe sentences imposed on narcotics offenders under the Sentencing Guidelines, the heavy reliance of the Guidelines on drug quantity as a dominant sentencing factor, and the recent effort of the Sentencing Commission to ameliorate

those factors by capping the maximum sentence for minor participants in large drug trafficking conspiracies. *See United States v. Ruiz*, 246 F.Supp.2d 263 (S.D.N.Y.2002). In this case, these factors are further complicated by the especially draconian penalties for distribution of crack cocaine, the so-called "safety valve" that mitigates punishment in certain circumstances in narcotics cases, and the disparities that can be created when participants in the same criminal transactions are sentenced at different times based on different information. As a consequence of these complexities, the Court has before it markedly different calculations of the applicable guideline sentence by the defendant, the Probation Office, and the Government, notwithstanding that all parties agree on the essential facts: that Perez was a salaried functionary of a street-level crack distribution organization, working as a sometime lookout and sometime delivery boy. The Probation Office calculates the sentencing range as 120–135 months (a minimum of ten years); the Government, after initially suggesting that the appropriate sentencing range could be as high as 235–293 months (a minimum of nearly twenty years), has now receded to the view that the appropriate range is 151–188 months (a minimum of twelve and a half years); and the defendant argues that the proper sentencing range is 46–57 months (a minimum of under four years). To understand this extraordinary variation in the calculations, it is necessary to understand the facts of the case, and the interaction of the different statutory and guideline elements applicable to them.

## FACTUAL BACKGROUND

*The Conduct Underlying the Conviction*

This case arises from a fairly routine narcotics investigation. In the absence of a trial or hearing, the Court accepts for present purposes the facts recited in the Pre–Sentence Report ("PSR") of the Probation Office, which are (at least in broad outline) accepted by both sides.

On November 8, 2000, in furtherance of an investigation into trafficking in crack cocaine in the area of West 138th Street in Manhattan, an undercover New York City police officer purchased approximately fifteen grams of crack for $435. The officer gave the money to an individual who passed it on to Porfirio Delarosa, who was eventually indicted in this case. Ramon Garcia, another defendant in this case, then appeared with the drugs, which were passed to the officer. On November 19, the officer purchased another 15 grams of crack from Delarosa and Garcia for $390, and on November 26, the officer returned and made another 15–gram purchase, from Garcia alone, also for $390. On December 13, 2000, the officer returned to the same location and agreed with Garcia and another individual to purchase 18 grams of crack for $470. On this occasion, the defendant Felix Perez appeared for the first time, delivering the drugs to the salesmen who passed it on to the undercover officer.

Five additional transactions took place between December 28, 2000, and April 13, 2001. In each case the pattern was similar: An undercover officer negotiated a purchase with one or two conspirators, and another conspirator would retrieve the agreed amount of narcotics from a secret location and provide it to the seller(s), who passed it to the undercover in exchange for the agreed sum of money. Occasionally, another conspirator would wait with the officer while the drugs were being retrieved, or accompany the officer to a different location, where the transaction would be completed. A total of nine individuals played these various roles. Perez was personally involved in four of the eight total transactions: In three, he delivered

the drugs and/or accompanied the purchaser to the place where the drugs were delivered, and in one, he was observed exchanging money with Delarosa and other conspirators who had engaged in the actual negotiations and delivery with the undercover officer.

These transactions all involved quantities in the same general range: much too large to be retail transactions with drug users, who typically purchase crack in $5 or $10 pieces, but hardly sales at the major wholesale level. In all, the undercover officers purchased 180 grams of crack cocaine for a total of $5535.

*Judicial Proceedings*

On July 6, 2001, Perez was arrested, along with Delarosa and Garcia. The record does not reflect whether the other individuals involved in the eight undercover transactions were ever identified by the police, arrested, or prosecuted. On August 2, 2001, the three defendants were charged in the instant federal indictment, charging them with conspiring between November 8, 2000, and April 13, 2001, to distribute in excess of 50 grams of crack cocaine. All three defendants pleaded guilty to conspiring with each other and with others.

Delarosa, a 43-year old man, was sentenced principally to 121 months in prison. The undisputed guideline calculation, set forth in a plea agreement between the parties, confirmed by the Probation Office, and independently found by the Court, was that trafficking in 180 grams of crack results in a base offense level of 34, reduced by three levels on account of Delarosa's timely guilty plea. Because a prior narcotics conviction placed him in criminal category II, the applicable guideline range was 121–151 months. The Court imposed a sentence at the bottom of the range, finding that a ten-year sentence was adequate to serve the purposes of deterrence and protection of the public.

Garcia, age 42, had no prior criminal convictions. Although his base offense level was the same as Delarosa's, having participated in the same conspiracy, he was able to benefit, as a nonviolent offender without a prior record, from the "safety valve" provision of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, by providing the government with "all information and evidence [he] has concerning [the conspiracy]," even though that information was insufficiently helpful to warrant a departure for providing substantial assistance in the prosecution of others. *See* U.S.S.G. § 5K1.1. The "safety valve" rule not only exempted Garcia from the statutory ten-year minimum sentence, but also provided him with an additional two-level reduction pursuant to U.S.S.G. § 2D1.1(b)(6). At the resulting level 29 and criminal history category I, Garcia's sentencing range was 87–108 months, and he too was sentenced at the bottom of the range.

Both Delarosa and Garcia negotiated plea agreements with the Government, pursuant to which the Government stipulated to the calculations set forth above, calculations with which the Probation Office and the Court agreed. Perez took a slightly different approach. He pled guilty without agreeing with the Government on a stipulated guideline calculation, apparently hoping to seek a more favorable calculation than the Government was prepared to accept, and to preserve his right to seek a downward departure, which the United States Attorney in this District requires to be waived as part of its standard plea agreement. The road to the plea was bumpy in other ways, as well. Perez did not plead guilty early enough to save the Government substantial resources; he pled on the morning his trial had been scheduled to begin. Moreover, he had failed to

appear on two separate occasions during the preceding week, when the Court had scheduled proceedings, at Perez's request, to consider motions to change his plea to guilty. Eventually, however, Perez did plead guilty.

Sentencing was adjourned repeatedly, first at the request of the overburdened Probation Department, on one occasion at the Government's request, but mostly because the defendant represented that he needed more time to gather materials for a departure request. (No doubt the pending effective date of the guideline amendment capping the base offense level for minor participants, *see* U.S.S.G. § 2D1.1(a)(3), provided a disincentive to expedite this investigation.) At any rate, Perez, like Garcia, sought to qualify for the "safety valve" by meeting with the Government to disclose his knowledge of the operations of the crack conspiracy.

*Perez's Safety Valve Proffer*

Perez's disclosures to the Government turned out to be a mixed blessing for him. On the one hand, the Government agrees that Perez's proffer was honest and complete, and entitles him to the benefits of the two-level downward adjustment and dispensation from the mandatory minimum. On the other hand, Perez's disclosures revealed that Delarosa's drug organization was more extensive and successful than the Government had previously been able to prove, and the Government accordingly argues that the facts he disclosed rendered him susceptible to significantly higher penalties than he faced at the outset.

According to the Government, Perez stated that he had worked for Delarosa as a salaried operative from December 1999 until his arrest in July 2001, and that during those 18 months, the organization distributed approximately 1.5 kilograms of crack per week. Moreover, according to the Government, Perez also stated that during this period he resided with Delarosa in an apartment where drugs were kept, and that Delarosa also kept a gun there. The Government contends that Perez's sentencing guidelines calculation should take these facts into account as relevant conduct, and that these facts vastly increase the applicable sentence. Of course, if the facts disclosed by Perez had been known at the time of Delarosa's sentencing, the Government might have sought a higher sentence in his case as well, but Delarosa's sentence is already final. The Government thus suggests that Perez's honesty in proffering his drug involvement has backfired, producing not only a higher sentence than he would otherwise have received, but also a higher sentence than his boss Delarosa himself received, in substantial part based on conduct engaged in not by Perez himself, but by Delarosa.

*The Various Guideline Calculations*

1. *The Probation Office*

The Probation Office originally reported to the Court that Perez should be sentenced at level 31 and criminal history category I, which results in a range of 108–135 months – except that, because of the mandatory ten-year minimum sentence imposed by statute, *see* 21 U.S.C. § 841(b)(1)(A)(iii), the effective range would be 120–135 months. But this original estimate has been doubly superseded by events. First, it appeared on the face of the report that the Probation Office's actual calculation was level 33, not level 31; apparently, the final conclusions and recommendations of the Probation Office overlooked a two-level addition for obstruction of justice, which the Probation Office found appropriate and included in its detailed findings earlier in the PSR. Second, after the PSR was prepared, the Government acknowledged that Perez had

become eligible for the safety valve reduction.

Thus, applying the actual calculations in the PSR, rather than its erroneous ultimate recommendation, and giving Perez credit for a safety valve reduction, the Probation Office's calculations run as follows:

- A base offense level of 34, the same base from which co-defendants Delarosa and Garcia began.
- An upward adjustment of two levels for obstruction of justice, because of Perez's failure to appear for his scheduled pleas in the first week of April, 2002.
- A two-level reduction for qualifying under the safety valve.
- A three-level reduction for timely acceptance of responsibility.

The adjusted Probation Office recommendation is, then, after all, for an offense level of 31, criminal history category 1, and a resulting sentence range of 108–135 months, with no mandatory 120–month minimum because of the safety valve provision.

2. *The Government*

The Government's position too has been in flux. Its initial position, reflected in the letter provided at the time of his guilty plea pursuant to *United States v. Pimentel,* 932 F.2d 1029 (2d Cir.1991) (requiring Government to advise defendant, in advance of guilty plea, of its projected position on the guideline calculation), was that Perez should be sentenced at level 36. This calculation began at the familiar base level 34. However, the Government contended that Perez should be denied any reduction for acceptance of responsibility, and that instead his sentencing range should be adjusted two levels upward for obstruction of justice, because of his fail-

ure to appear for the expected guilty plea. The resulting level 36 range would be 188 to 235 months, rendering the statutory mandatory minimum sentence moot.

After the preparation of the PSR, and taking into account the results of the proffer session, the Government adopted a different calculation, as follows:

- A base offense level of 38, the highest level on the narcotics table, because Perez admitted to being a knowing member of a conspiracy that moved in excess of 1.5 kilograms of crack – the threshold for level 38 – every week for a year and a half.
- A two-level upward adjustment for possession of a firearm in connection with a narcotics offense, as a result of co-conspirator Delarosa's possession of a gun.
- A two-level reduction for Perez's safety-valve eligibility.
- A *two*-level reduction for acceptance of responsibility, rather than a three-level reduction, because Perez's decision to plead guilty was sufficiently belated that he should not be entitled to the extra point available to those who "timely notify[ ] the authorities of [an] intention to plead guilty, thereby permitting the government to avoid preparing for trial." U.S.S.G. § 3E1.1.

The Government proclaimed its neutrality with respect to the obstruction of justice enhancement recommended by the Probation Office, and concluded that on its new calculation, the result was either (again) level 36, for a sentencing range of 188–235 months, if no obstruction points were added, or level 38, for a range of 235 to 293 months, if the Court found the obstruction of justice enhancement applicable.

After further reflection, the Government submitted yet another calculation. The Government's present position withdraws

its argument for a firearms enhancement, completely ignores the obstruction of justice issue, and adheres to its other sentencing positions. Thus, the Government's present position is that the correct sentencing level is 34 (although the Government's letter, in an apparent typographical error, actually states that the resulting level is 36), with a resulting range of 151 to 188 months of imprisonment.

### 3. *The Defendant*

On first glance, Perez's decision to offer the Government a safety-valve proffer (or at least, to offer a more honest one than might be common) appears to have been suicidal. The benefits apparently to be achieved (a two-point reduction and exemption from the ten-year minimum) pale in comparison to the risks of informing the Government of additional bad conduct that could increase the sentencing range by at least four levels, apparently making the mandatory minimum moot and resulting in a net increase rather than a decrease in the sentencing level.

But there is a method to the madness, which becomes apparent when the defendant's sentencing guideline calculation is understood. The critical hinge for this calculation is the November 2002 amendment capping the penalty for a minor participant in a narcotics conspiracy. U.S.S.G. § 2D1.1(a)(3). Before that amendment, a judicial finding that Perez was a minor participant in the crime would have reduced his sentencing range only by two levels, not enough to offset the higher base level resulting from disclosure of the additional drug trafficking. After it, however, any defendant who receives a mitigating role adjustment is limited to a base offense level of "not more than level 30." *Id.*

Arguing for a minor role adjustment and a lower base offense level would be pointless, however, without the safety valve, in the face of the mandatory minimum sentence. Since Perez faced a ten-year mandatory minimum sentence regardless of his guideline calculation, taking two points off the Probation Office's original calculation, or even driving it to a much lower level, would offer little benefit, since the sentence in any event could not go below ten years. The minor role adjustment thus can only benefit Perez if he is also relieved of the mandatory minimum, and the only way to do that was to qualify for the safety valve by disclosing the entire extent of the conspiracy to the Government. Conversely, the only way the safety valve strategy could be other than counterproductive (absent grounds for departure) would be if the minor participant reduction was granted. If the Court were to conclude that Perez was just a bit too involved to be awarded a mitigating role adjustment, the gamble of the proffer would be lost, and the safety-valve adjustment would be offset by the much higher base offense level.

Accordingly, arguing his eligibility for the minor role adjustment, Perez puts forward the following calculation:

- A base offense level of 30, because Perez allegedly qualifies for a mitigating role adjustment as a minor participant.

- A concomitant two-level reduction for being a minor participant.

- A two-level reduction for qualifying for the safety valve.

- A three-level reduction for acceptance of responsibility.

This results in a sentencing level of 23, with a resulting range of 46 to 57 months, from which defendant seeks further departures for extraordinary family circumstances and for various other reasons.

## DISCUSSION

*General Considerations*

The tensions in this case result in large part from certain anomalies in our current sentencing structure. First, the stakes for Perez from the outset are raised by the extraordinary penalties that attach to the distribution of crack cocaine. Whatever Perez actually did, what he was *caught* doing was limited to participating in a small number of small-to-medium drug sales, totaling 180 grams of crack, conducted on the street. Although the total value of the drugs involved in those transactions was less than $6000, because the Guidelines (following the lead of Congress) treat a gram of crack as the equivalent of 100 grams of powder cocaine, Perez and his co-defendants face a base punishment of more than twelve and a half years in prison. To put this into perspective, a seller of ordinary powder cocaine would have to sell at least 15 *kilograms* of cocaine to rise to the same base sentence level. At an approximate market price of $20,000 per kilogram, the wholesaler who sold the powder that someone in Delarosa's organization cooked into crack would have to sell drugs worth $300,000 to be put in the same category as Perez, who played a limited role in the retail distribution of the finished product. Put another way, a street seller who sold 180 grams of powder cocaine rather than of crack would be sentenced at level 18, within a range of 27 to 33 months.

It is not for this Court to decide whether this policy is wise, though it is difficult to rationalize the disparity. The responsibility for determining penalties lies with Congress and the Sentencing Commission, and not with individual judges. But the extreme penalties applicable in this case cannot be ignored, as they dramatically escalate the consequences of relatively small adjustments and relatively close questions of guideline interpretation.

Second, the Guidelines place an unrealistic importance on the total weight of drugs distributed over time, often by relatively low-level participants in the drug trade, to the extent that total is known to and provable by the authorities. With or without the facts proffered by Perez at the safety-valve interview, anyone who knows anything about the drug trade knows that the conspirators here sold more crack than was involved in the handful of transactions in which the purchasers happened to be undercover officers. Folks don't hang out on the same street corner from November till April, happy to sell crack to any undercover policeman who happens by from time to time, but otherwise merely innocently enjoying the air. Yet the guidelines determine the punishment for people who (the evidence demonstrates) are nothing less—and also nothing more—than professional street-corner drug dealers, not by determining an appropriate punishment for this class of offenders, but according to the total weight of drugs that the Government can prove by a preponderance of the evidence that the dealers sold. That weight is typically an entirely arbitrary amount, which reflects not the defendant's real culpability, but simply the quantity of drugs the dealer had on him when arrested, or the length of time the investigators were prepared to devote to making undercover purchases, or, as in this case, the offender's willingness to disclose the extent of his wrongdoing. *See United States v. Lara*, 47 F.3d 60, 65–67 (2d Cir.1995) (affirming departure where aggregate quantities of drugs sold over lengthy period resulted in excessive sentence, and noting criticisms of heavy reliance of drug guidelines on aggregate quantities).

Had the undercover officer simply "busted" the dealers after the first transaction, the penalty would have been about five years; by waiting until several transactions were consummated, the penalty escalated to over twelve; with Perez's admissions, the sentence can reach twenty or more years. But no rational person could imagine, upon hearing that the conspirators sold 180 grams to undercover officers in casual street-level transactions over six months, that they had not sold far more crack over that period. Particularly where the incremental punishment mounts so dramatically based on small and inexpensive quantities of a drug, the emphasis on quantity can result in huge differences in punishment based on virtually meaningless differences in actual culpability.

Third, as the Commission itself has pointed out, the difficulties inherent in its mandate are exacerbated by mandatory minimum sentences. Whatever else can be said about the Guidelines' quantity-driven drug sentences, they for the most part present a smooth pattern of guideline sentences gradually increasing as the drug quantity rises, adjusted to some extent in particular cases by equally gradual reductions or additions for role in the offense or other factors bearing on the sentence. Mandatory minimum sentences, however, create "cliffs" that disrupt the gradual slope of the guidelines, by canceling out for many offenders the effect of adjustments or departures to which the offender would otherwise be entitled. In this case, for example, the statutory mandatory minimum would prevent Perez from benefitting from a finding that he was only a minor participant in the offense—a factor the Sentencing Commission regards as highly significant to the appropriate sentence—unless he can benefit from the "safety valve" by making dangerous admissions to the Government.

Fourth, in an effort to reduce the cruelty and arbitrariness of these sentencing rules, Congress and the Sentencing Commission has adopted certain mitigating rules. But these rules have the incidental effect of further enhancing "cliff" problems. Recognizing that the mandatory sentences are too harsh at least for some offenders, Congress and the Commission created the safety valve to permit a small category of drug defendants to avoid the mandatory sentence and to take advantage of mitigating adjustments or departures that would otherwise be available. But the safety valve has a large impact on some offenders and very little on others, depending on drug type and quantity and the extent of the adjustments and departures for which the offender is eligible; for some, the effect is simply that of a two-point reduction, while for others, safety-valve eligibility can result in a substantial reduction in sentence. The cap on the punishment of minor players, adopted by the Commission to mitigate the effect of over-reliance on drug quantity, creates similar anomalies: a minor player in a small organization gets only a two-level reduction, but a minor player in a large conspiracy can see his sentence level drop by ten levels. And of course, whether a defendant was a minor player is often a close and subjective question, such that small nuances of role can result in dramatic rises and falls in sentencing result.

These are the background conditions which generate the issues in this case. The pressure placed on defendants by the heavy penalties involved can generate risky strategic choices, and in an atmosphere in which every point is significant, the possibility of large swings of sentence based on close differences in offender conduct poses difficult questions for the sentencing court, questions which sometimes seem to bear little relation to the real guilt

of the defendant.[1]

*Base Offense Level*

■ Although neither the Government nor the Court knew it at the time Delarosa himself was sentenced, the amount of crack distributed by the Delarosa organization was vastly in excess of 1.5 kilograms, and thus would presumptively require a base offense level of 38. Nothing in the sentencing guidelines excludes from consideration relevant conduct disclosed by a defendant in the course of providing information to the Government in an effort to qualify for the safety-valve adjustment. Indeed, both Perez and his lawyer signed an agreement with the Government before the proffer session expressly agreeing that "the Government may offer at any stage of the criminal proceeding for any purpose any statement made by [Perez] during the meeting." (December 13, 2002, Letter from AUSA Preetinder Bharara to B. Alan Seidler, Esq., at 1.) Moreover, the entire quantity of crack disclosed by Perez constitutes relevant conduct as to him under U.S.S.G. § 1B1.3. The sales took place in furtherance of the very conspiracy to which Perez pled guilty, and all of the conduct in question was foreseeable by, and indeed known at the time to, Perez, who is the only source of the Government's information that such conduct took place. Thus, unless mitigated by the minor role adjustment, the base offense level is 38. (As noted above, absent the safety-valve proffer, the base offense level would be only 34.)

*Possession of a Firearm*

The Government has withdrawn its earlier contention that Perez's offense level should be enhanced by two additional levels because of Delarosa's possession of a firearm. Perez had argued that the adjustment was inapplicable, because Delarosa had not possessed the gun for purposes related to the drug conspiracy. Although the Court is required to make its own independent calculation of the correct guidelines range, in this case, as often happens, the Court's sources of information are limited. Here, the only evidence that Delarosa ever had a gun of any kind, to say nothing of what he did with it or why he had it, is the testimony of Perez himself. Since the Government accepts (or at least chooses not to dispute) Perez's characterization of the facts, the Court is unable to find facts supporting the enhancement by a preponderance of the evidence. Accordingly, no adjustment on this basis is found.

*Obstruction of Justice*

■ The Probation Office recommends a finding of obstruction of justice, as a result of Perez's failure to appear to plead guilty on two separate occasions when he had arranged to do so. The Government takes no position on the matter. Perez objects to the enhancement.

■ U.S.S.G. § 3C1.1 provides for a possible enhancement of the offense level where the defendant "wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing" in the case. The Commentary to this provision lists "examples of the types of conduct" that can constitute obstruction, including "wilfully

---

1. It should be pointed out that these difficulties are not for the most part inherent in a sentencing guidelines system—although, the more inflexible a guidelines system is, and the more resistant to discretionary departures, the more painful anomalies in the specific guideline rules will be. The features I have noted above are attributes of particular rules relating to narcotics sentencing under the present Guidelines, not problems with the policy of guideline sentencing.

failing to appear, as ordered, for a judicial proceeding." U.S.S.G. § 3C1.1, Application Note 4(e). However, as the Second Circuit has repeatedly emphasized, to apply this enhancement it is not enough to find that a defendant failed to appear, or uttered false testimony, or engaged in any of the other acts listed in Application Note 4. In order for the adjustment to apply, the defendant must have "had the specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice." *United States v. Brown,* 321 F.3d 347, 351 (2d Cir.2003) (quoting *United States v. Woodard,* 239 F.3d 159, 162 (2d Cir.2001)).

While there is some ambiguity about why Perez failed to appear for the scheduled pleas (illness of a child, confusion about times or dates, or just plain cold feet), there is no basis for ascribing to him an intention of wasting the Court's time, or of otherwise thwarting the administration of justice. The dates in question were scheduled at the defendant's request, to permit him an opportunity to change his plea from not guilty to guilty. There is no indication that Perez sought to flee or to avoid being tried on the indictment; to the contrary, he duly appeared on the date originally scheduled for trial and entered a plea of guilty. The Court thus finds that whatever the reason for his non-appearance, his intention cannot be found by a preponderance of the evidence to have been to obstruct or impede justice. Accordingly, this adjustment will not be applied.

### Mitigating Role Adjustment

■ The Sentencing Guidelines provide "adjustments to the offense level based upon the role the defendant played in committing the offense." U.S.S.G., Introductory Commentary to Ch. 3 Pt. B. The role adjustments are to be made on the basis of all relevant conduct, and not merely on the basis of the acts cited in the count of conviction. *Id.* A mitigating role adjustment applies where the defendant was a "minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). While this adjustment itself is a modest two-level reduction in the offense level, *id.,* if a narcotics defendant receives such an adjustment, the determination of minor participation has the further effect that the base offense level against which the adjustment is applied is itself reduced to no higher than 30. U.S.S.G. § 2D1.1(a)(3). As noted above, this makes a dramatic difference in a case such as this.

A defendant is eligible for a mitigating role adjustment where he "plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Application Note 3(A). He is a "minor participant" if he meets this standard and "is less culpable than most other participants, but [his] role could not be described as minimal." *Id.,* Application Note 5. Second Circuit case law makes clear that "a minor role adjustment is not available merely on a showing that the defendant 'played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be "minor" . . . as compared to the average participant in such a crime.'" *United States v. Kwok Ching Yu,* 285 F.3d 192, 200 (2d Cir.2002) (quoting *United States v. Rahman,* 189 F.3d 88, 159 (2d Cir.1999)).

■ The Court of Appeals has also repeatedly emphasized that the "assessment of the defendant's role in criminal activity is highly fact-specific." *United States v. Shonubi,* 998 F.2d 84, 90 (2d Cir.1993), *quoted in United States v. Carpenter,* 252 F.3d 230, 234 (2d Cir.2001). Among the variety of factors to be considered are "the defendant's relationship to other participants, the importance of the defendant's

actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *Shonubi*, 998 F.2d at 90. *See also* U.S.S.G. § 3B1.2, Application Note 3(C) ("The determination whether to apply [a mitigating role adjustment] involves a determination that is heavily dependent on the facts of the particular case.").

■■■ As this Court has previously had occasion to note, "the sentencing court's evaluation of a defendant's role in the offense must to some extent depend on the scope of the criminal activity involved, that is, on 'the defendant's culpability in the context of the facts of the case.'" *Ruiz*, 246 F.Supp.2d 263, 269, quoting *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir.1990). Someone whose role is "average" vis-a-vis a particular street-level sale might turn out to be a minor or even minimal participant in the context of an extensive drug distribution network. As the Court ruled in *Ruiz*, because "the Sentencing Guidelines strive to create a rational scheme, [in which] the various offense levels and adjustments are intended to result in a punishment geared to each defendant's culpability," a court, when deciding the applicability of a minor role adjustment, "should not lose sight of the effect of the adjustment on the fairness of the resulting sentence." *Id.* Analyzing the Second Circuit's decisions in this regard, the Court held that in determining the "average participant in such a crime," a court must ask who is the participant "whose culpability is normative (neither enhanced nor mitigated) for the punishment level assigned by the Sentencing Commission to" "a conspiracy of the magnitude that determines the base offense level." *Id.* at 270. On the facts of this case, in other words, the question is whether Perez is "substantially less culpable" than the typical seller of in excess of 1.5 kilograms of crack whom the Sentencing Commission presumably had in mind in deciding that such an offender merits punishment at level 38, that is, imprisonment for approximately 20 years.

As is often the case, different facts can be adduced in support of different analyses of this question. Perez points out that like Ruiz, and like the defendant in *United States v. Martinez*, No. 00 Cr. 1306(RWS), 2002 WL 1041318 (S.D.N.Y. May 22, 2002), he did not have an ownership interest in the drugs, did not finance the operation, did not negotiate the sale of the drugs, and had no decision-making authority in the enterprise. (Indeed, he may have had less authority than Ruiz, who "exercised some discretion in handling his part of the transaction, and was trusted by the conspirators to take possession of millions of dollars worth of drugs." *Ruiz*, 246 F.Supp.2d at 272–73.) The Government rightly points out, on the other hand, that unlike Ruiz, who was apparently a one-time courier recruited to pick up a very large shipment of drugs in furtherance of a vast international drug conspiracy, Perez's role in this conspiracy was extended. To the extent that his role was limited, serving as a lookout or a delivery boy, he played that role on a regular basis for an extended period of time, as a regular salaried employee of the business. Moreover, unlike Martinez, Perez (as his own safety-valve proffer makes clear), had considerable knowledge of "the scope and structure of the enterprise," *Martinez*, 2002 WL 1041318, at *1. Unlike Ruiz, he was not "subordinate to several layers of authority in the organization," *Ruiz*, 246 F.Supp.2d at 271–72, apparently working directly for Delarosa, the apparent leader of the enterprise.

Ultimately, however, these point-by-point comparisons with particular defendants in other cases lose sight of the es-

sential issue facing the Court, which is the appropriateness of treating Perez at the same level of culpability as someone like Delarosa, his employer, who apparently *did* own the drugs, earn the profits, and make the decisions. In crafting sentences in the range of twenty years' imprisonment for those who sell kilogram quantities of crack, the Sentencing Commission presumably had in mind, as the "average" participants in such a crime, people who, with or without the assistance of others, exercise some meaningful control over such quantities of drugs, whether in a single large transaction or in a series of smaller ones. Employees of such dealers, who play distinctly subordinate roles in the transactions in question, may well play an important part in the harms caused by the narcotics trade, just as delivery persons and similar employees play an important role in the success of legitimate enterprises. Such employees, however, play a "substantially" smaller role than those with decision-making authority and/or an ownership interest in the enterprise.

When a prosecution focuses on an individual small narcotics transaction, or a small series of such transactions, the punishment is relatively modest, and the relationships among the players may well be more obscure based on the limited evidence available from typical "buy and bust" investigations. In such a setting, it makes eminent sense to punish "steerers"

and lookouts, the person who takes the payment and the person who delivers the drugs, equally; none can easily be identified as playing a substantially lesser role than the others, or than the "average" participant in such an operation. Perez's proffered testimony, however, which the Government not only does not dispute but relies on for its account of the extent of the relevant conduct, provides a clearer insight into a much larger and more diversified conspiracy. Once it is known that a larger enterprise existed, it no longer makes sense to see salaried employees functioning in limited roles as "average" participants in a multi-kilogram narcotics operation, to be treated equally with someone who sold such quantities of drugs for his own profit.[2] Accordingly, the Court finds that Perez, within the context of the scope of criminal conduct for which he is here being held accountable, was a minor participant in that conduct.

The finding that Perez is a minor participant in the conspiracy limits his base offense level to 30 pursuant to U.S.S.G. § 2D1.1(a)(3), and also provides him with a two-level reduction pursuant to U.S.S.G. § 3B1.2(b). *See id.*, Application Note 6 (in drug cases, mitigating role adjustment to be applied to base level determined under § 2D1.1(a)(3)).

*Acceptance of Responsibility*

▮ The Probation Department recommends a three-level downward adjustment

---

2. It could be argued, of course, that had the Government and the Court known at the time of Delarosa's sentence that he occupied a supervisory role over Perez and/or others, the sentences of Perez and Delarosa could have been differentiated by assigning to Delarosa an aggravating role adjustment to U.S.S.G. § 3B1.1. But this misses the point of the comparison. The question is not how Perez or Delarosa compare to each other, but how they each compare to the "average" participant in such an offense. If the average seller of 1.5 kilograms of crack contemplated by the

Sentencing Commission *is a criminal who owns the drugs and will profit from such a sale or sales*, candidates for aggravating or mitigating adjustments must be judged against that standard. Delarosa may be still more culpable than such an offender to the extent that, unlike the solo entrepreneur, he organized or supervised other participants in a criminal enterprise. Perez may nevertheless be substantially less culpable than such a normative kilogram dealer, because of his subordinate role.

for acceptance of responsibility; the Government argues that the adjustment should be only two levels. It is undisputed that Perez, by pleading guilty, has qualified for the two-point reduction for accepting responsibility for his offense under U.S.S.G. § 3E1.1(a). Under U.S.S.G. § 3E1.1(b), at least as it existed at the time of Perez's offense and at the time of his plea, the third point was available where the defendant assisted the authorities either by "timely" providing complete information to the government concerning his own involvement in the offense or by "timely" pleading guilty, thus permitting the Government and the Court to allocate resources efficiently.

While Perez's failures to appear to plead guilty do not constitute obstruction of justice, they do disqualify him from getting credit for the third point under § 3E1.1(b). Clearly, a plea on the morning scheduled for trial does not permit the Government to "avoid preparing for trial." U.S.S.G. § 3E1.1(b)(2). While Perez did "notify[ ]" the Government in advance of his intent to plead guilty (*id.*), his repeated failures to appear surely prevented the Court or the Government from being confident that a trial would not be required. Nor can a proffer session to take advantage of the safety valve, which took place on December 13, 2002, more than seventeen months after arrest, over seven months after the guilty plea and scheduled trial date, and long after the originally-scheduled sentencing date, be regarded as "timely" disclosure of his own criminal conduct.

Accordingly, the Court finds that only a two-level reduction for acceptance of responsibility is appropriate. This reduction brings the defendant's offense level down to 26.

*Safety Valve*

The Government and the defendant agree that Perez satisfies the requirements for a two-level reduction under the safety valve provision. U.S.S.G. §§ 2D1.1(b)(6) and 5C1.2. This reduction results in a total offense level of 24. Because it is undisputed that Perez is in criminal history category I, the resulting sentencing range is 51–63 months.

*Departures*

■ Perez seeks a downward departure from this range on a variety of grounds, as well as on the combination of those grounds. Primarily, he asks the Court to depart because of extraordinary family circumstances, noting that despite his youth, he has fathered three small children, who live with their mothers or with his mother. In addition, he seeks departure based on some combination of his rehabilitation since his arrest, potential vulnerability in prison, and an asthma condition.

The Court recognizes that it has discretion, in an appropriate case, to depart on such grounds. The argument for a departure in this case, however, is meritless, and the Court declines to exercise its discretion on any of these grounds. Perez's family circumstances are, alas, all too typical of youthful narcotics conspiracy offenders who come before this Court. Having fathered several small children is not extraordinary, and as the PSR makes clear, his role in their upbringing has not been central. The record does not support any finding that the other grounds alluded to rise to a level warranting a sentencing departure.

Finally, as noted below, the factors applicable to the sentence here, in the Court's view, do not even justify a sentence at the low end of the applicable sentencing range, let alone a departure from it.

## SENTENCE

The sentencing guideline range applicable in this case represents a somewhat

awkward blend of the high penalties that result, especially in the case of crack, from the cumulation of many small sales that cause a low-level street dealer to be treated as the equivalent of a substantial drug wholesaler, with the dramatic reduction in penalties for minor players that the Sentencing Commission has crafted as a partial offset to the resulting injustices. The resulting hybrid of these two rough measures of culpability produces a somewhat arbitrary result, the more so as the finding that Perez is a minor participant is a close call. In selecting a sentence within this range, the Court is cognizant of the lengthy period of time during which Perez served within the drug organization, the seriousness with which Congress and the Sentencing Commission treat sales of crack, and the fact that the amount of drugs distributed by the organization of which Perez was a part was actually well in excess of the amount necessary to reach the highest base offense level in drug distribution cases. Taking all of these factors into account, the Court finds it appropriate to sentence Perez at the top of the applicable guideline range.

Accordingly, the defendant will be sentenced principally to imprisonment for 63 months.

SO ORDERED.