**UNITED STATES of America,**

v.

**Jorge Manuel Torres TEYER, a/k/a "Jorge Carlos Moreno," a/k/a "Oso," Victor Manuel Adan Carrasco, and Oscar Moreno Aguirre, Defendants.**

**No. 01 CR 21GEL.**

United States District Court, S.D. New York.

April 29, 2004.

---

Anirudh Bansal, Richard Sullivan, Assistant United States Attorneys, New York City (David N. Kelly, United States Attorney for the Southern District of New York), for the United States of America.

Paul E. Warburgh, New York City, for Defendant Jorge Manuel Torres Teyer.

George R. Goltzer, New York City, for Defendant Victor Manuel Adan Carrasco.

Winston Lee, New York City, for Defendant Oscar Moreno Aguirre.

### SENTENCING OPINION

LYNCH, District Judge.

The three defendants in this case pled guilty to charges including conspiracy to import cocaine into the United States, 21 U.S.C. § 963, and use of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). Because the conspiracy involved in excess of 150

kilograms of cocaine, a fact not disputed by the defendants, the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") prescribe a base offense level of 38 for each defendant.[1] U.S.S.G. § 2D1.1(c)(1). Indeed, it is undisputed that the defendants were arrested in Belize in possession of some 1500 kilograms of cocaine destined for the U.S. market. The parties agreed, however, to leave several other issues relevant to sentencing for resolution after an evidentiary hearing, *see United States v. Fatico*, 603 F.2d 1053 (2d Cir.1979); *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), which the Court held on March 3 and 4, 2004. This opinion sets forth the factual findings and legal conclusions required to arrive at appropriate sentences for each defendant.

## DISCUSSION

### I. *Jorge Torres–Teyer*

#### A. *Role in the Offense*

■ The Government argues that Torres–Teyer should receive a four-level "aggravating role" adjustment because he acted as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). To impose this adjustment, the Court must find "(i) that the defendant was 'an organizer or leader,' and (ii) that the criminal activity either 'involved five or more participants' or 'was otherwise extensive.'" *United States v. Zagari*, 111 F.3d 307, 330 (2d Cir.1997) (internal quotation marks omitted). The

evidence overwhelmingly, by far more than a preponderance, justifies these findings.

■ First, while the Government need not establish that Torres–Teyer managed five or more participants (evidence of "otherwise extensive" criminal activity also suffices), *United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir.2000), it cannot be disputed that the criminal activity here involved more than five people. Counting only those directly supervised by Torres–Teyer, the participants included Liston McCord, codefendants Carrasco and Aguirre, the crew of Mexican laborers or seamen who worked with McCord to transfer cocaine from large to small boats (*e.g.*, Michael, Chilango, Alfredo, Gordo) (Tr. 111, 122–23, 126, 133), the sea captains who responded to Torres–Teyer's orders, and assorted pistoleros and laborers. (*Id.* 166–67.)

Second, Torres–Teyer unquestionably acted as an organizer and leader of the conspiracy. The evidence seized from his apartment in Belize, where authorities found the 1500 kilograms of cocaine, included a black folder containing copies of facsimile communications giving directives to boat captains and others regarding the transport of cocaine from Colombia to Mexico by sea. That Torres–Teyer wrote these facsimile communications is clear: Belizean authorities found them in his apartment; according to Liston McCord, a cooperating witness whom the Court finds highly credible,[2] the handwriting matches

---

1. The Guidelines in effect on the date of the defendant's sentencing govern unless their application would violate the Ex Post Facto Clause. 18 U.S.C. § 3553(a)(4)(A); *United States v. Gitten*, 231 F.3d 77, 79 (2d Cir.2000). The sentences in this case present no *ex post facto* issue, and it is undisputed that the April 30, 2003, version of the Guidelines applies.

2. At this point, it is appropriate to make a general finding with regard to McCord's credibility. McCord impressed the Court as a highly credible witness, and the Court finds that he testified truthfully in all respects. His demeanor showed candor and sincerity; he took evident care not to embellish his testimony; he did not falter in the face of vigorous cross-examination; and both independent evidence, such as the items seized from Torres–

that of Torres–Teyer (Tr. 163, 169); and they were signed by "Oso," which in Spanish means "bear," a nickname for Torres–Teyer. (*Id.* 123–24.) The content of the communications also confirms that he wrote them. In one, the author advises coconspirators that he has assumed the new identity "Jorge Carlos Moreno" and obtained a death certificate for "Jorge Torres–T." (GX 71.) In another, he instructs members of the conspiracy how to find the apartment complex where he then lived and to ask for Carlos Moreno, his assumed identity in Belize. (GX 81.) Jorge Carlos Moreno is also the name that Torres–Teyer gave to the Belizean police who stopped him for driving in the wrong direction on a one-way street, the incident that led to the discovery of the 1500 kilograms of cocaine and the apprehension of codefendants Carrasco and Aguirre. (Torres–Teyer PSR ¶ 12.) The inference is inescapable that Torres–Teyer authored numerous directives to a large number of conspirators.

Moreover, McCord testified that Torres–Teyer recruited him and gave him orders about the transportation of more than a dozen cocaine shipments, generally in amounts of at least 1500 kilograms. (Tr. 93–98, 125–26.) The totality of McCord's testimony made absolutely clear that Torres–Teyer organized and planned these shipments, and the seized records not only corroborate that testimony – they independently establish that he played exactly this leadership role.

At a minimum, the evidence therefore establishes that Torres–Teyer was a manager or supervisor of the narcotics organization in which he participated. *See United States v. Payne,* 63 F.3d 1200, 1212 (2d Cir.1995) ("A defendant acts as a manager or supervisor of a criminal enterprise involving at least five participants if he exercises some degree of control over others involved in the commission of the offense or plays a significant role in the decision to recruit or to supervise lower-level participants.") (internal citations, brackets and quotation marks omitted). Distinguishing a "manager or supervisor," U.S.S.G. § 3B1.1(b), from an "organizer or leader," *id.* § 3B1.1(a), may well be more of an art than a science. Concededly, Torres–Teyer was not *the* leader of the entire narcotics trafficking conspiracy. The evidence shows that he reported to Alcides Ramon Magana and Albion Quintero Meraz, persons whom Special Agent Matthew John O'Brien of the Drug Enforcement Administration ("DEA") described as "heads of the organization" (Tr. 70), and superiors at times sent others to check up on Torres–Teyer. (*Id.* 176–77.)

But for Torres–Teyer to qualify as an organizer or leader, it is not necessary that he have been at the pinnacle of authority within the hierarchy of the narcotics trafficking organization, or that he have masterminded the entire conspiracy. *See United States v. DeRiggi,* 72 F.3d 7, 8 (2d Cir.1995); *United States v. Garcia,* 936 F.2d 648, 656 (2d Cir.1991); *see also* U.S.S.G. § 3B1.1, Application Note 4; *United States v. Beaulieau,* 959 F.2d 375, 379–80 (2d Cir.1992) (canvassing factors

---

Teyer's apartment, and his own contemporaneous diary, which enabled McCord to testify precisely as to dates and events that might otherwise have faded from his memory, corroborated McCord's testimony. The internal form and content of this diary establish overwhelmingly its reliability and authenticity, which defendants do not in any event dispute. Indeed, for the diary to be an after-the-fact

forgery, McCord would have to be a highly skilled forger. No evidence suggests that he possessed such skills. While McCord may have made been mistaken about some minor details, and equivocated a bit about the whereabouts of some of his ill-gotten gains, on the essential questions of his activities and those of the defendants, the Court credits him absolutely.

to be considered in determining whether defendant qualifies as an "organizer or leader"). Torres–Teyer quite literally organized the Belizean trans-shipment operation, which itself qualifies as a highly complex criminal activity and a major part of the overall importation scheme. He did not act as a mere manager or supervisor, but as a high-level operative who recruited, supervised, and directed dozens of individuals and organized their activity. (G.Br.15–19.) *See United States v. Si Lu Tian,* 339 F.3d 143, 156–58 (2d Cir.2003). Moreover, some of those whom Torres–Teyer supervised, such as McCord and the sea captains, themselves played significant roles in the conspiracy and enjoyed supervisory authority over other co-conspirators. Torres–Teyer's level of responsibility, and the number of people he organized and directed, dwarfs that of others who have received a four-level enhancement for being an organizer or leader. *See, e.g., United States v. Napoli,* 179 F.3d 1, 14 (2d Cir.1999); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 183 (2d Cir.1990).

Accordingly, the Court finds an "aggravating role" enhancement for being an "organizer or leader" warranted. This adjustment brings Torres–Teyer's offense level to 42.

### B. *Use of Airplane*

The Government's letter pursuant to *United States v. Pimentel,* 932 F.2d 1029, 1034 (2d Cir.1991), contemplated, and the Probation Department recommended, a two-level enhancement for use of an aircraft in connection with narcotics trafficking. (Torres–Teyer PSR ¶¶ 7(c), 41.) U.S.S.G. § 2D1.1(b)(2)(A). But the Government introduced no evidence at the hearing regarding use of an airplane, and in its post-hearing submission, did not argue that an enhancement for such use

should be applied. On one occasion, Torres–Teyer and McCord apparently arranged for the use of an airstrip for a projected transfer of drugs by air, after the failure of a trans-shipment by boat due to a hurricane. (Tr. 184–86; GX 69.) But no evidence suggests that this plot succeeded. Indeed, it seems that this shipment is the one that Belizean authorities eventually seized, resulting in the defendants' arrest. Accordingly, this enhancement will not be applied.

### C. *Acceptance of Responsibility and Obstruction of Justice*

Torres–Teyer pled guilty to the entire indictment. He acknowledged his guilt for both the conspiracy to import and distribute cocaine and the use of firearms in furtherance of that scheme. He is therefore presumptively entitled to a downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1(a). Furthermore, as to Torres–Teyer, unlike his codefendants, the Government does not dispute that he timely notified it of his intention to plead guilty, sparing both the Court and the Government the time and resources necessary to prepare for trial. Accordingly, if he qualifies for acceptance of responsibility, he would receive another one-level reduction pursuant to U.S.S.G. § 3E1.1(b).

The Government contends and the PSR recommends, however, that credit for acceptance of responsibility should be denied and, instead, a two-level enhancement for obstruction of justice imposed. *See* U.S.S.G. § 3C1.1. The Government cites several alleged plots by Torres–Teyer to intimidate witnesses, escape from custody, and proffer false cooperation in an effort to obtain a reduction of his sentence. (G.Br.16.) Only one of these alleged plots was adequately proved.

The PSR's recommendation relies on a purported effort by Torres–Teyer to bribe

Belizean officials to refuse to extradite him to the United States. (Torres–Teyer PSR ¶ 35, 46.) McCord's testimony, as well as documentary evidence introduced by the Government, amply established the general nature of this alleged scheme. (Tr. 194–97; GX 251–62.) According to the plan, Carrasco and Aguirre would accept full responsibility for the cocaine seized in Torres–Teyer's apartment in exchange for $100,000, as well as a car and a house, for each of them, while Torres–Teyer, McCord, and Torres–Teyer's girlfriend would be exonerated in exchange for the payment of a $250,000 bribe to the chief magistrate in charge of the case.

No evidence, however, establishes that the magistrate, the Honorable Herbert Lord, in fact received such a bribe or even agreed to the scheme; indeed, Torres–Teyer provided an affidavit from Magistrate Lord in which Lord states that "[a]t no time while the case was before me in Magistrate's Court did anyone offer a bribe for me to release any of the ... defendants on bail or to dismiss any of the charges against [them]." (Lord Aff. ¶ 5.) Moreover, the witness Errol Gentle, a Belizean prison official, testified to Magistrate Lord's good reputation. (Tr. 315–16.) Finally, McCord had no first-hand knowledge that any bribe had been paid, nor could he have.

At the same time, notes written by Torres–Teyer during his imprisonment with McCord in Belize strongly corroborate McCord's account of an *attempt* to arrange such a bribe. These notes establish, through Torres–Teyer's own words, that he intended to bribe Carrasco and Aguirre to provide false testimony (GX 253–55) and "to pay off the judge," and that he had arranged to make available the money to bribe them. (GX 255.) The Court therefore finds that Torres–Teyer willfully attempted to obstruct justice during the course of his prosecution for this offense.

This conduct, however, raises an issue of law regarding § 3C1.1's application. While the PSR characterizes Torres–Teyer's bribery attempt as an effort to avoid extradition to the United States, the evidence suggests that the plot actually aimed to secure an acquittal on the charges brought against him in Belize. The § 3C1.1 enhancement applies to obstructive conduct "related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." Because the conduct for which Belize initiated Torres–Teyer's prosecution constitutes a part of his offense of conviction in the United States, or at the very least "a closely related offense," the enhancement would appear literally to apply. But the question remains whether the bribery plot aimed to obstruct justice in the United States, and if it did not, whether § 3C1.1 applies where a defendant attempts to obstruct a foreign prosecution for an offense that is relevant conduct or an offense closely related to the offense of conviction in the United States.

No evidence suggests that Torres–Teyer's bribery scheme aimed to avoid extradition. To the contrary, affirmative evidence indicates that Torres thought that the United States either could not or would not secure his extradition in any event. (GX 260.) As a matter of law, however, the Court sees no basis to distinguish between attempts to obstruct Belizean and United States justice in connection with this prosecution, at least on the facts of this case.

First, although no evidence suggests that Torres–Teyer's plot aimed specifically to avoid extradition to the United States, Torres–Teyer unquestionably remained concerned that he would be held accountable by the United States for his crimes.

Government Exhibit 260 establishes that although Torres–Teyer did not expect to be extradited, he nevertheless recognized the dangers posed by the DEA and the possibility of prosecution in the United States for importing cocaine into this country. Moreover, it is clear that Torres–Teyer's and McCord's release from the Belize prison would have obstructed the investigation of Torres–Teyer by United States authorities and, indeed, this prosecution. Perhaps in some circumstances, in some countries, efforts to take advantage of an already corrupt system of justice might not qualify for the § 3C1.1 enhancement. But on the facts of this case, where the investigation and prosecution in Belize, on the one hand, and Torres–Teyer's investigation by the DEA and other United States authorities, on the other, were closely intertwined, Torres–Teyer's effort to frustrate the Belizean prosecution would reasonably be expected to have an effect on the prosecution here.[3] Accordingly, the enhancement for obstruction will be applied.

■ The Government argues, as the PSR recommends, that application of the § 3C1.1 enhancement automatically negates Torres–Teyer's entitlement to credit for acceptance of responsibility. (G. Br. 34; Torres–Teyer PSR. ¶ 46.) Both the Government and the PSR cite Application Note 4 to U.S.S.G. § 3E1.1, which states that "[c]onduct resulting in an enhancement under § 3C1.1 ... ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." *See, e.g., United States v. Restrepo,* 936 F.2d 661,

---

**3.** Torres–Teyer cites *United States v. Azeem,* 946 F.2d 13 (2d Cir.1991), and *United States v. Chunza–Plazas,* 45 F.3d 51 (2d Cir.1995), for the proposition "that criminal conduct committed by a foreigner in a foreign country can not be considered as relevant conduct or be used as the basis of an upward departure." (Torres–Teyer Br. 3.) Neither case can be so broadly construed. In *Azeem,* the court made clear that foreign crimes should not be used to calculate a defendant's base offense level, 946 F.2d at 17, principally because in that case the defendant's importation of three kilograms of heroin from Pakistan to Egypt could not be deemed a crime *against the United States. Id.* at 16–17. Hence, the district court had erred by adding the three kilograms of heroin involved in the foreign transaction to the mere one kilogram of heroin that the defendant had intended to import *into the United States. Id.* In *Chunza–Plazas,* the Second Circuit held that the district court erred by departing upward by sixteen levels based on the defendant's "alleged prior acts of homicide, terrorism, and drug trafficking in Colombia," 45 F.3d at 56, where he had been convicted in the United States only for possession of false immigration documents. The court reasoned that "[l]ike Azeem's Egyptian conspiracy, Chunza's illegal activities in Colombia were not crimes *against the United*

*States,* and therefore should not be included in the guidelines calculation," particularly where, unlike in *Azeem,* those alleged crimes could not plausibly be deemed "part of the same course of conduct" as the defendant's possession of false immigration documents. *Id.* at 57–58 (emphasis added). By contrast, in *United States v. Greer,* 285 F.3d 158 (2d Cir.2002), the Second Circuit distinguished *Azeem* on the ground that even though the vast majority of the narcotics at issue were destined for Canada, the total drug quantity should have been considered by the district court because the defendants' acts violated a U.S. criminal statute, the Maritime Drug Law Enforcement Act, which specifically covers foreign conduct. *Id.* at 179–80; *see also United States v. Cox,* 299 F.3d 143, 146–48 (2d Cir.2002) (distinguishing *Chunza–Plazas* as concerned with dissimilar criminal conduct); *United States v. Dawn,* 129 F.3d 878, 885 (7th Cir.1997) (distinguishing both *Azeem* and *Chunza–Plazas* as concerned with criminal acts not in violation of U.S. law or directed against the United States). Here, Torres–Teyer's attempted obstruction of Belizean justice was both part of the same course of conduct and related to, albeit perhaps not explicitly directed at, Torres–Teyer's criminal prosecution in the United States for conspiracy to import cocaine *into the United States.*

669 (2d Cir.1991) (affirming sentencing court's application of both § 3C1.1 and § 3E1.1).

The Second Circuit has not yet articulated a standard or set of guidelines to determine whether a case qualifies as "extraordinary" within the meaning of Application Note 4. Two views predominate in other circuits. *See United States v. Salazar–Samaniega*, 361 F.3d 1271, 1279–80 (10th Cir.2004) (canvassing each). In *United States v. Hopper*, 27 F.3d 378 (9th Cir. 1994), the Ninth Circuit held that

> the relevant inquiry for determining if a case is an extraordinary case within the meaning of Application Note 4 is whether the defendant's obstructive conduct is *not inconsistent* with the defendant's acceptance of responsibility. Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice.

*Id.* at 383 (emphasis in original); *accord, United States v. Gregory*, 315 F.3d 637, 640 (6th Cir.2003); *but see United States v. Buckley*, 192 F.3d 708, 711 (7th Cir. 1999) (rejecting *Hopper* in part because "[t]he fact that a defendant having done everything he could to obstruct justice runs out of tricks, throws in the towel, and pleads guilty does not make him a prime candidate for rehabilitation").

By contrast, in *United States v. Honken*, 184 F.3d 961 (8th Cir.1999), the Eighth Circuit opined that sentencing courts should consider

> the totality of the circumstances, including the nature of the [defendant]'s obstructive conduct and the degree of [defendant]'s acceptance of responsibility. Among other things, the district court should ... consider[ ] whether, for example, the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution. It should ... consider whether [defendant] voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement.

*Id.* at 968. The Fifth, Seventh, and Tenth Circuits have adopted this view in substance. *See Salazar–Samaniega*, 361 F.3d at 1279–80.

On the facts of this case, the Court need not choose between these rival standards, for under either view, this case qualifies as "extraordinary." Torres–Teyer's bribery scheme occurred not only long before any question of acceptance of responsibility arose, but in another country, before he even directly faced charges in the United States. Once extradited to the United States, Torres–Teyer pled guilty and fully acknowledged his crimes. The Sentencing Commission adopted the adjustment for acceptance of responsibility to create an incentive for defendants to plead guilty, admit their crimes, and thereby save both the Government's and the Court's resources in preparing for and conducting trial. Were courts to hold that any obstructive conduct, however early in the investigation or prosecution of a case and whatever its relationship to the charges ultimately brought, forever disentitled a defendant to credit for later acceptance of responsibility, this incentive would be ill served.

To be sure, obstructive conduct closely related in time to the defendant's guilty plea – and, without question, any such conduct perpetrated after the plea – might well establish that a defendant did not truly accept his guilt and persisted in his criminal activities. That is, however, far from the case here. The scheme to obstruct the prosecution in Belize predated

Torres–Teyer's guilty plea and occurred not only in a very different context, but in a very different legal system. The Court does not entertain the naive notion that Torres–Teyer's guilty plea necessarily indicates a genuine, fundamental change of heart or renunciation of his criminal history. But § 3E1.1 does not require the Court to look into the defendant's soul. Like many defendants, Torres–Teyer may have chosen to plead guilty simply because he recognized the virtual certainty of his conviction. Nevertheless, rather than consume government and judicial resources in the hope of securing an irrational verdict – or worse still, persist in attempts to corrupt or intimidate witnesses or jurors in an effort to secure his acquittal – Torres–Teyer rightly threw in the towel and admitted his guilt. On these facts, that suffices to entitle him to an adjustment pursuant to § 3E1.1, reducing his offense level to 41.

The Government introduced evidence of other obstructive conduct by Torres–Teyer of a far more violent nature, which, if adequately proved, would likely alter the foregoing conclusion. First, Errol Gentle, the superintendent of the Belize prison, testified that he received information concerning a plot to kidnap him and his family in an effort to extort the release of Torres–Teyer. (Tr. 300–01.) Second, McCord testified that he learned of an alleged plot by Torres–Teyer to assassinate him while he remained incarcerated in Belize. (Id. 202–04.) Third, Eugenio Cabrera, a convicted Cuban drug dealer and former fellow-inmate of Torres–Teyer's in the Metropolitan Correction Center, testified that Torres–Teyer approached him in an effort to obtain information about a cooperating witness in the federal Witness Security Program, in furtherance of an alleged assassination plot. (Tr. 339–44).

The cumulative nature of this evidence strongly suggests Torres–Teyer's dangerousness, and the Bureau of Prisons may well deem it prudent to consider these allegations in assessing the security risk that Torres–Teyer poses. The question for the Court, however, is whether the Government has proved any of these alleged plots by a preponderance of the evidence. It has not.

While the Court credits both Gentle and McCord, finding their testimony to be a truthful and sincere account of their genuine fears, neither had first-hand evidence of the alleged threats. A prison guard, who allegedly had been approached to participate in the plan by someone whom Gentle characterized as a notorious Belizean criminal, advised Gentle of the alleged threat to him and his family. (Tr. 300–02, 307–08.) Gentle and the Belize police justifiably treated this alleged plot seriously and took prudent countermeasures, but the evidence of its existence does not depend on Gentle's undoubted credibility; it depends, at a minimum, on that of the Belizean guard, who did not testify before the Court. And that guard's understanding of the plot depends on yet a further level of hearsay: the statements made to him by the known criminal who allegedly attempted to recruit him to assist with the plot. Moreover, none of these sources, so far as the record indicates, said that Torres–Teyer organized the plot. It is far from an inevitable inference that he did. His superiors in the Mexican cocaine cartel had incentives to secure his freedom, both in order to retain his services and loyalty and to prevent his cooperation with Mexican or U.S. authorities. Finally, no documentary evidence suggests that Torres–Teyer expected to be released from prison by means of this plot. Based on what he acknowledged to McCord, he apparently placed his hopes for release in the bribery scheme.

Proof of the alleged plot to assassinate McCord likewise relies on hearsay. A cell-mate told McCord that Torres–Teyer had enlisted him to bludgeon McCord to death, but that he did not want to carry out this deed, both because he liked McCord and because he was scheduled to be released shortly and feared that he would incur a further sentence. (Tr. 202–03.) Again, the prisoner in question did not testify, and the Court therefore cannot evaluate his credibility. It is possible that he sought to curry favor with McCord or to extort money or other benefits from him by posing as his rescuer.

Finally, as to the third alleged plot, the Government does not contend that Torres–Teyer actually intended to harm the cooperator about whom he allegedly spoke with Cabrera. The Government characterizes this plot as a "plan to report to the Government a concocted plot to murder a Witness Security Program inmate in an effort to obtain a cooperation agreement, and thereby a sentencing reduction [under U.S.S.G. § 5K1.1], through fraud." (G.Br.32.) This alleged plot is far too murky to justify a finding of obstruction. Cabrera made a reluctant and unforthcoming witness. While the Court does not necessarily discredit his testimony, neither can it confidently determine, based on Cabrera's testimony alone, the nuanced details about a conversation between two would-be jailhouse informants. Such a detailed determination would be necessary to decide who was trying to entrap whom, who first raised the question of the witness's assassination, and in what context.

Even assuming that Cabrera accurately reported that Torres first raised the subject of the witness, and that Torres did so with the hope that he might thereby entrap Cabrera into misconduct that he could report to the authorities in an effort to secure a § 5K1.1 letter, the Court could not find, as a matter of law, that Torres–Teyer therefore had the specific intent to obstruct justice. *See United States v. Brown*, 321 F.3d 347, 351 (2d Cir.2003) (emphasizing that to impose an enhancement for obstruction, district courts must expressly find that the defendant "consciously acted with the purpose of obstructing justice") (internal quotation marks omitted). An attempt to "entrap" a fellow inmate with a view to securing a § 5K1.1 letter may well be wrong or reprehensible, and it might appropriately disqualify a would-be cooperator from securing an agreement with the Government. But such an attempt does not necessarily indicate the specific intent to obstruct justice, particularly where, as here, the defendant is a foreigner, unfamiliar with our legal system, who cannot be expected to understand subtle distinctions in the law of entrapment or the Government's regulations for informants. Accordingly, the Court cannot find that the alleged conversations between Cabrera and Torres–Teyer constituted further obstruction of justice on the part of Torres–Teyer.

For these reasons, the Court cannot find, by a preponderance of the evidence, that Torres–Teyer is guilty of any obstructive scheme other than the bribery plot in Belize. That scheme, for the reasons stated above, warrants a two-level enhancement for obstruction of justice, raising his offense level to 44,[4] but does not preclude

---

**4.** The Sentencing Table of the Guidelines provides for no higher offense level than 43, which dictates a sentencing "range" of life imprisonment, even for a first-time offender. A level 44 sentence therefore does not, strictly speaking, exist under the Guidelines. Still,

nothing in the Guidelines suggests that calculations yielding an offense level of 44 or higher cannot be an interim step toward arriving at the appropriate sentencing level. Nor do the Guidelines state or imply that whenever an applicable adjustment pushes the interim

a three-level downward adjustment for timely acceptance of responsibility, bringing Torres–Teyer's adjusted offense level to 41.

### D. *Upward Departure*

■ The evidence that establishes Torres–Teyer's leadership also establishes that he played a substantial role in the importation of vast amounts of cocaine, far more than the amount required to qualify him for the highest offense level under the Guidelines. The evidence easily supports a finding that Torres–Teyer's activities involved the importation of 15,000 kilograms, perhaps more – at a minimum, more than 100 times the amount that would justify a base offense level of 38. Application Note 16 to U.S.S.G. § 2D1.1 provides that "an upward departure may be justified where the quantity is at least *ten* times the minimum quantity required for level 38." (Emphasis added.) Torres–Teyer's conduct goes far beyond the level necessary to consider a departure on this basis.

While the Guidelines explicitly permit an upward departure under these circumstances, the Court still must decide whether to exercise its discretion to depart. On the one hand, the Court is skeptical that so much importance should be placed on the sheer quantity of drugs, to the exclusion of other factors bearing on Torres–Teyer's role in the drug trade and dangerousness. But in this case, the facts virtually compel the conclusion that a departure is warranted. First, absent grounds for a downward departure, the Guidelines set a base offense level of 38 for individuals who traffic in a "mere" 150 kilograms (a very large quantity of drugs), and yet other defendants sentenced by this Court who have been at or near that level do not compare to Torres–Teyer in terms of their importance and involvement in narcotics trafficking. Even recognizing that Congress has already established the sentences for narcotics offenses at dramatically high levels, well past the point of diminishing returns, to sentence Torres–Teyer at the same level as someone who distributed 150 kilograms of cocaine (or, still more astoundingly, a mere 1.5 kilograms of cocaine in the form of crack) would be of highly questionable equity. The sheer volume of drugs matters in this case because it is so extraordinary.

Second, the relevant conduct involved in this conspiracy goes well beyond the shipment of drugs. McCord testified credibly that the conspirators possessed large numbers of firearms, and the written notes in evidence include orders for the provision of weapons, including machine guns, and chilling instructions to boat captains engaged in drug delivery. For example, Torres–Teyer instructed members of the conspiracy that if purported customers did not give the correct password, they should "shoot them all and kill them." Similarly, if the purported customers did not deliver the appropriate amounts of money, in the right color suitcases, in the right sequence, Torres–Teyer instructed his subordinates to "kill them all." (GX 66.) Even though weapons possession by or at the direction of Torres–Teyer is taken into account in his 18 U.S.C. § 924(c) conviction, that statute would be violated if the defendant possessed a single pistol in furtherance of the cocaine conspiracy, while the evidence establishes that Torres–Teyer personally possessed a veritable arsenal of weapons at his home. (GX 37.) He also supervised men who appeared at landing sites with assault rifles. (Tr. 122.) The Court notes that appellate courts have approved upward departures, beyond the adjustment for possession of a weapon, in narcotics

calculation to a level above 43, any portion of the adjustment should be disregarded.

cases where the defendant possessed a large number of weapons. *See United States v. Davis,* 176 F.3d 489, 1999 WL 236561, at *2 (10th Cir.1993) (table); *United States v. Nakagawa,* 924 F.2d 800, 804–05 (9th Cir.1991). Taking account of all of this relevant conduct, Torres–Teyer's culpability vastly exceeds that of a defendant who simply imports or distributes 150 kilograms of cocaine.[5]

These circumstances clearly justify an upward departure. Were Torres–Teyer's offense level any lower than it already has been determined to be, the Court would depart upward by two levels. Indeed, such a departure would appear modest in view of the extent to which the relevant conduct at issue in this case vastly exceeds the mere distribution of 150 kilograms of cocaine, the conduct that provides the base offense level for this crime. In particular, were it to be found that the Court erred by enhancing Torres–Teyer's offense level for obstruction of justice in relation to the proceedings in Belize, reducing his offense level to 39, the Court emphatically would depart upward to level 41.

Because, however, the Court has already calculated Torres–Teyer's offense level to be 41, it need not depart to achieve an appropriate sentence. The Sentencing Reform Act directs a court to depart when it finds "that there exists an aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission ... *that should result in a sentence different from that described"* in the Guidelines. 18 U.S.C. § 3553(b) (emphasis added). For the reasons stated above, the mammoth scope of this conspiracy and the extraordinary quantity of weaponry involved constitute aggravating circumstances not adequately accounted for in the Guidelines or the additional sentence provided for by 18 U.S.C. § 924(c). Given the already extreme sentence prescribed for Torres–Teyer, however, these factors do not require "a sentence different from that described."

For a defendant with no criminal history, level 41 prescribes a sentencing range of between 324 and 405 months. For the narcotics crimes alone, the Guidelines therefore authorize the Court to impose a sentence in excess of thirty-three years in prison, which would be followed by a mandatory five-year consecutive sentence for use of a firearm in furtherance of that crime. 18 U.S.C. § 924(c)(1)(A)(i). Torres–Teyer is now forty years old. A sen-

---

**5.** The Government also alleges that Torres bears responsibility for a murder in Belize. (G.Br.38.) The only evidence supporting this allegation, however, is the uncorroborated, uncross-examined statement of one Benjamin Reyes Cabanas, a drug dealer seeking to cooperate with the Mexican authorities. (GX 901; Tr. 326–28.) While both Mexican and U.S. authorities appear to find Cabanas credible, the Court cannot independently evaluate his credibility; the statement is entirely devoid of details and does not even identify the alleged victim; and no effort has been made either to corroborate the statement or to determine whether the Belizean authorities can confirm the occurrence of this alleged homicide. Moreover, the alleged killing did not take place in furtherance of the present conspiracy, but in the context of an independent, freelance narcotics deal by Torres–Teyer. (Tr. 326.) Finally, according to his statement, Cabanas learned about this homicide from Torres–Teyer's own confession (*id.*), or perhaps more accurately, boast. Even were the Court to credit Cabanas, it thus could not conclude with any confidence that the murder in fact occurred, as opposed to that Torres engaged in braggadocio to intimidate or gain credibility with a criminal associate. Accordingly, the Court cannot find by a preponderance of the evidence that Torres is guilty of a homicide in Belize. Even if it could, given the absence of a relationship between the alleged homicide and the criminal conduct at issue here, *Chunza–Plazas* would preclude the Court from relying on that homicide as the basis for an upward departure. *See* 45 F.3d at 57–58.

tence within the Guidelines range will effectively incarcerate him until the age of eighty. The only possible upward departure would be a life sentence.

While a life sentence, on this record, would hardly be unjust, in view of Torres–Teyer's guilty plea, an unparolable life sentence would not serve the interests of justice. A sentence that will imprison Torres–Teyer for *nearly* his life, until he is well beyond the point of representing a danger to society, will adequately protect the public, deter similar criminals, and punish Torres–Teyer's transgressions, while still holding out to him the hope that he will not die in prison – a factor that may serve as an incentive to future guilty pleas and will give Torres–Teyer some credit for his acceptance of responsibility, which would effectively be cancelled by an upward departure.

Accordingly, the Court finds that (a) Torres–Teyer's offense level is 41; (b) his criminal history category is I; and (c) the Guidelines establish a sentencing range for him of 324 to 405 months. Torres–Teyer's sentence on the narcotics conspiracy counts will in any event be followed by a mandatory consecutive sentence of 60 months pursuant to 18 U.S.C. § 924(c).

## II. *Victor Manuel Adan Carrasco*

Belizean authorities arrested Victor Manuel Adan Carrasco [6] at Torres–Teyer's apartment, in possession of 1500 kilograms of cocaine destined for the United States. Evidence at the hearing, including McCord's testimony, establishes that Carrasco played a significant role in the transshipment of a large number of cocaine cargos of a similar size, and it is undisputed that Carrasco's base offense level on the narcotics conspiracy charge is 38. The Government seeks a number of enhancements, an upward departure, and denial of acceptance of responsibility credit.

### A. *Role in the Offense*

### 1. *Aggravating Role*

The Government seeks to characterize Carrasco as a "manager or supervisor." U.S.S.G. § 3B1.1(b). It argues that Carrasco supervised the crew of sailors or stevedores who accompanied McCord to transfer cocaine from ships arriving from Colombia to McCord's smaller boats for delivery to Mexico. (G.Br.21–22.) But while Torres–Teyer identified Carrasco as his "representative in Belize" (Tr. 146), and McCord characterized Carrasco as "in charge of the decision making" on the boat trips (*id.* 148), McCord's testimony as a whole does not in fact bear out these characterizations of Carrasco's level of authority.

Unquestionably, Carrasco enjoyed a position of some responsibility in the organization, and Torres–Teyer entrusted him with the transfers of cocaine from the Columbian ships to boats destined for Mexico. But McCord did not testify that Carrasco gave orders to anyone or made decisions of any real consequence. McCord testified that whenever a problem with a shipment of drugs arose, Carrasco would call Torres–Teyer for instructions on how to proceed and then relay those instructions to McCord, his crew, and the ship captains. (Tr. 153–54.) Carrasco does not appear to have enjoyed

---

**6.** According to the PSR, "the defendant was born Jesus Helmer Cobarubias." (Carrasco PSR ¶ 53.) McCord and others knew and generally referred to him as "Elmer." (Tr. 145.) The Government and the PSR refer to him as "Carrasco," while defense counsel refers to him as "Adan–Carrasco." For the sake of simplicity and consistency, the Court will refer to this defendant as Carrasco, notwithstanding that Adan–Carrasco may be the appropriate Mexican convention and that his true name may be Cobarubias.

independent decision-making authority, or to have given, as opposed to merely relayed, orders. Doubtless he in some sense exercised authority over the crew members, who provided no more than manual labor, but that alone does not suffice to support a finding that he exercised managerial or supervisory authority.

 To be sure, as the Government emphasizes, managing even a single person may suffice to qualify a defendant for the § 3B1.1(b) enhancement, *see, e.g., Payne,* 63 F.3d at 1212, and "[i]t is irrelevant that [the defendant] may have undertaken ... supervisory activities at someone else's behest; what is dispositive is that he took a management role in the criminal scheme." *United States v. Leonard,* 37 F.3d 32, 38 (2d Cir.1994). But it is the context of a defendant's activities that defines his role in the criminal activity at issue. In a vast, hierarchical criminal organization, countless persons conceivably could qualify as managers or supervisors, provided only that their role does not lie at the very bottom of the pyramid of criminal authority. Crew members surely could be characterized, at most, as minor participants in the conspiracy; were everyone with authority to direct even a single stevedore deemed a "manager or supervisor," qualifying him for an enhancement, it would be difficult to identify any "ordinary" or "average" conspirators. A head stevedore, for example, who recruits other stevedores to carry out the loading and unloading of narcotics shipments, supervises their work, and gives orders to his crew could in a certain sense be characterized as a manager or supervisor. Yet he could hardly be characterized as bearing substantially more culpability than the average participant in a multinational narcotics trafficking conspiracy such as the one for which defendants stand convicted. While such a "chief stevedore" clearly supervised

and managed others, and moreover, understood the criminal nature of the operation in which he participated, it would be strained, at best, to say that "he took a management role in the criminal scheme," where that scheme involves multiple, transnational shipments of vast quantities of cocaine over a substantial period of time. Indeed, he may well have been prepared to offer himself and his crew as laborers for any number of shipping operations, criminal or not; that a criminal operative in a vast narcotics conspiracy recruited him to supervise the transfer of narcotics, as opposed to agricultural produce, from boat to boat may well have been fortuitous.

Of course, Carrasco cannot be deemed a mere laborer in charge of other laborers. He did, as the evidence makes clear, enjoy some degree of authority. The question is whether that degree of authority, in the context of the overall criminal conduct at issue here, qualifies as managerial or supervisory in nature, such that Carrasco bears substantially more culpability than the average participant. Common sense and the objectives of punishment must be considered in determining the proper application of role enhancements under the Guidelines. Carrasco's base offense level of 38 prescribes a sentence of between twenty and twenty-five years. His conduct took place in the context of a major narcotics trafficking conspiracy and, specifically, the projected shipment of a substantial quantity of drugs into the United States. A three-level increase in this context would correspond to another ninety months of imprisonment. As a matter of logic and the recognized goals of punishment, it would be implausible to ascribe to the Sentencing Commission an intent to impose an additional seven and one-half years of incarceration on a defendant like Carrasco. He did not exercise a general supervisory authority over other members

of the conspiracy. Only in a limited context and a particular situation did Carrasco, as the senior conspirator present, have the minor responsibility of calling Torres–Teyer to receive instructions in the event of problems with certain drug shipments. While Carrasco thus played a *comparatively* more significant role than that of minor participants who simply provided "muscle" (whether literally, as laborers, or in the colloquial sense, as security guards), that does not constitute a managerial or supervisory role in the context of this case.[7]

Finally, no evidence supports the conclusion in the PSR that Carrasco supervised "the cartel's security crew." (Carrasco PSR ¶ 42.) Carrasco's mere presence at the apartment where Torres–Teyer stored the cocaine, and the fact that he may have "outranked" Aguirre, an armed guard on the scene, does not suffice to render him a "security supervisor." The Government introduced no evidence indicating that Carrasco gave any orders to Aguirre, or had any supervisory responsibility over

him or other pistoleros. Accordingly, the § 3B1.1(b) upward adjustment will not be applied.

### 2. Mitigating Role

■ Carrasco argues, in contrast, that he merits a minor role adjustment pursuant to U.S.S.G. § 3B1.2 (Carrasco Br. 5), characterizing himself as "expendable and at the bottom of the food chain." (*Id.* 3.) On the facts here, that characterization cannot be sustained. While Carrasco does not, for the reasons just explained, qualify as a "manager or supervisor" within the meaning of the Guidelines, neither can he be deemed a mere minor participant. Carrasco played important roles in the conspiracy, in handling narcotics shipments and reporting both *to* Torres–Teyer about any problems that arose, as well as *on* Torres–Teyer's activities to leaders of the cartel. Carrasco therefore clearly operated with some autonomy and authority. He cannot be characterized as some sort of mere laborer, and accordingly, his involvement cannot be deemed minor.[8]

---

7. The Government also notes that one Peluchas, Carrasco's cousin (Tr. 176), told Carrasco, who purportedly bears some familial relationship to the head a major narcotics cartel (Carrasco Br. 4 n. 3; Tr. 146), to keep watch on Torres–Teyer "because he was not being attentive to the business." (Tr. 176–77.) Carrasco may well have performed this task, and indeed, Torres–Teyer evidently required such supervision, for his reckless and irresponsible behavior, including driving in the wrong direction on a one-way street and then attempting to bribe the Belizean police with cocaine, led directly to the apprehension of the defendants. But while Carrasco may have served as a spy for some chief of the conspiracy, a spy is different from a manager. No evidence suggests that Carrasco actually gave any orders or exercised any authority over Torres–Teyer; to the contrary, he appears to have taken orders from Torres–Teyer.

8. Carrasco also points to McCord's testimony that Torres–Teyer concocted a plan whereby Carrasco and Aguirre, in exchange for certain

bribes, would take the blame and accept a prison sentence of three or four years, while Torres–Teyer and McCord would receive favorable treatment based on their bribery of the presiding magistrate. This plan, Carrasco argues, would be inherently implausible were he truly the nephew of a powerful cartel leader. (Carrasco Br. 3 & n. 1, 4 n. 3.) That certain conspirators did not regard Carrasco as important enough to justify an attempt to secure his release from prison (even assuming that this is what the incident implies) does not make him a minor participant. Under the Guidelines, a defendant's role is determined by what he does relative to the "average participant," not by his relationship, if any, to a leader of the conspiracy or by whether others view him as significant enough to ensure that he benefits from a plot to obstruct justice. It is the nature of Carrasco's *participation* in the conspiracy that does or does not "make[ ] him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Application Note 3(A).

### B. *Possession of a Weapon*

The Government argues that Carrasco's sentence should be enhanced by two levels for possession of a dangerous weapon. (G.Br.28–31.) *See* U.S.S.G. § 2D1.1(b)(1). McCord testified clearly, credibly, and persuasively that Carrasco carried a 9–millimeter pistol and an AR–15 assault rifle on various drug-running trips. (Tr. 146–49.) Accordingly, the Court finds by a preponderance of the evidence that an adjustment under § 2D1.1(b)(1) is appropriate, bringing Carrasco's offense level to 40.

### C. *Acceptance of Responsibility*

█ The Government initially argued that Carrasco should be denied all credit for acceptance of responsibility because he pled guilty belatedly, on the morning of trial. (Tr. 5.) Although the Government has apparently abandoned this argument, in the interest of completeness, the Court will briefly elaborate on the reasons, set forth at length in the transcript of the hearing (*id.* 5–16), for rejecting it.

The Guidelines specifically provide a sanction for belated guilty pleas that fail adequately to save the resources of the Government and the Court. Defendants who plead at an early stage qualify for an additional one-level reduction that is correspondingly unavailable for belated pleas. U.S.S.G. § 3E1.1(b). It is undisputed that Carrasco and Aguirre do not qualify for this additional point. That a defendant can earn an *additional* one-level reduction merely by notifying the authorities of his intention to plead early enough to "permit[ ] the government to avoid preparing for trial," U.S.S.G. § 3E1.1(b)(2), strongly implies that defendants may qualify for the basic two-level adjustment for acceptance of responsibility, *id.* § 3E1.1(a), without doing so.

█ This does not mean that the timeliness of a guilty plea is irrelevant to a defendant's qualification for the acceptance of responsibility adjustment. Application Note 1(h) to § 3E1.1 provides that the timeliness of the plea is one factor to be considered in determining acceptance of responsibility. Certainly, a guilty plea after the Government has concluded presenting its case, or during the jury's deliberations, might well be so late that its untimeliness alone would justify denying the defendant credit for acceptance of responsibility. Moreover, under some circumstances, a plea on the morning of trial, in combination with other factors discussed in Application Note 1, would suffice to warrant denial of credit. But the paramount factor in determining eligibility for § 3E1.1 credit is whether the defendant truthfully admits the conduct comprising the offense or offenses of conviction. U.S.S.G. § 3E1.1, Application Note 1(a). Carrasco did that, and he did so in a sufficiently timely manner so as to avoid a lengthy trial and avert the risk of an irrational verdict.

The Government initially argued that Carrasco and Aguirre deliberately delayed their plea in the hope that Torres–Teyer's various alleged plots to intimidate witnesses and otherwise obstruct justice might come to fruition, and that they only pled when assured that the expected witnesses would indeed testify. (Tr. 8.) This claim is entirely speculative. First, virtually no evidence suggests that Torres–Teyer continued to conspire to harm witnesses at this late stage. Second, Torres–Teyer himself pled guilty at an earlier date than Carrasco, a sure sign that the remaining defendants could not expect him to deliver them from conviction. Third, Carrasco's counsel credibly provided the alternative explanation that Carrasco and Aguirre decided to plead guilty only after the Government provided disclosures pursuant to 18 U.S.C. § 3500, which made clear that their

one potentially meritorious defense – that the Government could not prove that the conspirators intended to ship the cocaine to the United States rather than to Europe or Asia – would fail. (Tr. 11–12.) Again, credit for acceptance of responsibility does not depend upon the defendant's moral conversion. It would be obtuse and unfair to hold that defendants who plead guilty after reviewing tape transcripts made available well before trial pursuant to Fed. R.Crim.P. 16, indicating their inevitable convictions, have genuinely accepted responsibility, while those who were not taped and must await delivery of 3500 material to learn of the strength of the Government's case against them remain mere cynical manipulators, less deserving of the two-level reduction. The record thus provides no basis on which to deny Carrasco (or Aguirre) credit for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a); at the same time, it is clear that these defendants do not qualify for the third point available for early pleas under § 3E1.1(b). The two-level reduction brings Carrasco's offense level back to 38.

### D. *Upward Departure*

 Finally, the Government argues that the sheer quantity of cocaine involved here warrants an upward departure for Carrasco. While noting that quantity would provide a permissible basis for departure, U.S.S.G. § 2D1.1, Application Note 16, the Court declines to exercise its discretion to depart. At some point, there is clearly a law of diminishing returns to escalating drug sentences based on quantity. For kingpins like Torres–Teyer, involved in a quasi-proprietary way with organizing vast shipments of drugs, such an upward departure may be appropriate. But Carrasco played a limited role in the admittedly huge shipments he personally handled. The sentence authorized by offense level 38 will adequately punish him for that role. At the same time, the excess quantity of drugs will be taken into account in deciding where within the permissible Guidelines range to set Carrasco's sentence; a sentence toward the top of that range should be anticipated.

### E. *Downward Departure*

Carrasco argues that the Court should depart downward because he spent ten months in an Belizean prison, which he characterizes as "an extraordinarily harsh environment filled with fear, danger, violence, rape and corruption." (Carrasco Br. 5.) *See United States v. Mateo*, 299 F.Supp.2d 201, 211 (S.D.N.Y.2004) (departing downward based on defendant's subjection to sexual abuse by federal detention facility guards and the failure to provide her medical attention during a prolonged and painful child birth); *United States v. Francis*, 129 F.Supp.2d 612, 619 (S.D.N.Y.2001) (departing downward based on defendant's thirteen and one-half month pretrial detention at a state facility where he suffered severe physical and psychological trauma "under qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons").

 In *United States v. Carty*, 264 F.3d 191 (2d Cir.2001) (per curiam), the Second Circuit held "that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *Id.* at 196; *see also Mateo*, 299 F.Supp.2d at 207–12. As a general matter, however, a departure on this basis lies only "where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *Id.* at 208. In *Carty*, for exam-

ple, the Second Circuit considered the circumstances of a defendant allegedly

> held in a four-foot by eight-foot cell with three or four other inmates. There was no light in his cell. He received ten to fifteen minutes per day outside of his cell to bathe and was allowed to make only one phone call per week. He had no running water in his cell. His only toilet was a hole in the ground. He was denied access to paper, pens, newspaper, and radio. While incarcerated in the Dominican Republic, he lost forty pounds.

264 F.3d at 193. The court clarified that, as a matter of law, such circumstances *could* warrant a departure and remanded the case to the district court to consider the appropriateness of such a departure on the facts. *Id.* at 196–97.[9]

The record here does not provide sufficient evidence to justify a downward departure on the basis of the allegedly deplorable conditions of Carrasco's detention in Belize. Even assuming that conditions comparable to those described in *Carty* would warrant a downward departure, the record furnishes no basis to conclude that Carrasco suffered from such conditions while detained in Belize. Undoubtedly, the conditions of confinement in Belize compare unfavorably to those in most U.S. detention facilities. But the evidence in this case establishes neither that conditions in the particular facility in which Carrasco served time were "extreme to an exceptional degree" nor that they fell

"upon [Carrasco] in some highly unique or disproportionate manner." *Mateo*, 299 F.Supp.2d at 208. The Court also notes that Gentle, a Belizean prison superintendent, testified that prisoners receive two to three hours of recreation daily, medical attention as needed, social visits, and adequate food (Tr. 312–14), prison conditions far better than those at issue in *Carty*. Moreover, the Guidelines range applicable to Carrasco in this case prescribes a sentence of about twenty years. Carrasco spent approximately ten months detained in Belize. Absent evidence of truly horrific conditions, subjection to substandard detention conditions for ten months does not warrant a meaningful departure from a twenty-year sentence.

Accordingly, the Court finds that (a) Carrasco's offense level is 38; (b) his criminal history category is I; and (c) the Guidelines establish a sentencing range for him of 235 to 293 months.

### III. *Oscar Moreno Aguirre*

Belizean authorities apprehended Oscar Moreno Aguirre[10] at Torres–Teyer's apartment, the site of the seizure of the 1500 kilograms of cocaine. At the time, he carried a 9-millimeter semi-automatic pistol. (Aguirre PSR ¶ 13.) Aguirre pled guilty to the narcotics conspiracy counts and the § 924(c) count for carrying a firearm during and in relation to a drug trafficking crime. As with the other defendants, the quantity of cocaine involved makes his presumptive base offense level

---

**9.** The Government notes that the district court in *Carty* subsequently declined to depart downward on the basis of this defendant's substandard pretrial detention conditions in view of, among other factors, the severity of his crimes and obstruction of justice. (G. Reply Br. 3; *see also id.*, Ex. A at 23–24.)

**10.** Defense counsel refers to his client as "Aguirre," as did several witnesses during the

hearing, while the Government refers to him, probably more in keeping with the conventions of Mexican nomenclature, as "Moreno Aguirre." For simplicity and consistency, and to avoid any potential for confusion with Torres–Teyer's alias ("Jorge Carlos Moreno"), the Court will refer to this defendant as Aguirre.

38. The Government argues, however, that the Court should deny Aguirre credit for acceptance of responsibility because of his belated plea. For the reasons discussed above in connection with Carrasco, that argument is rejected, and a two-level reduction pursuant to U.S.S.G. § 3E1.1(a) will be awarded, bringing Aguirre's presumptive offense level for the narcotics counts to 36, which prescribes a sentencing range of 188 to 235 months. That sentence will be followed by a mandatory 60–month sentence on the firearm count.

■■■ Aguirre argues, however, that he merits a further downward adjustment because his role in the offense should be characterized as minor under U.S.S.G. § 3B1.2(b). The Government not only opposes this adjustment, but seeks an upward departure pursuant to U.S.S.G. § 2D1.1, Application Note 16, because the amount of the drug shipment vastly exceeds that required to qualify a defendant for the base offense level 38. (G.Br.35–37.) The Guidelines permit a reduction for minor role where the defendant "plays a part in committing the offense that makes him substantially less culpable than the average participant" in that offense. U.S.S.G. § 3B1.2, Application Note 3(A). In *United States v. Kwok Ching Yu*, 285 F.3d 192 (2d Cir.2002), the Second Circuit emphasized that "a minor role adjustment is not available merely on a showing that the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' . . . as compared to the average participant in such a crime." *Id.* at 200 (internal quotation marks omitted). Moreover, "[a] sentencing court's assessment of the defendant's role in criminal activity is highly fact-specific and depends upon the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the

success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir.1993) (internal quotation marks omitted).

■■■ As emphasized above, this standard calls for an analysis of the context of the defendant's crime. To decide whether a narcotics conspiracy defendant played a minor role "as compared to the average participant in *such a crime*," *Kwok Ching Yu*, 285 F.3d at 200 (internal quotation marks omitted; emphasis added), a court must address not his role as compared to narcotics dealers generally, but to participants in the particular kind of conspiracy for which he stands convicted. A mere "steerer" in a street-level drug sale may play a significant role in selling one vial of crack cocaine, *see United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir.1989) ("steerer" not a minimal participant); *cf. United States v. Garcia*, 920 F.2d 153, 155 (2d Cir.1990) (courier not automatically a minor participant), but obviously would be a trivial player in the context of a multinational conspiracy involving the distribution of multiple, very large shipments of narcotics.

The Guidelines themselves, however, provide scant guidance as to how to identify who qualifies as "average," U.S.S.G. § 3B1.2, Application Note 3(A), in the context of a major drug conspiracy:

> Large drug conspiracies may involve an extensive, vertically integrated network of manufacturers, packagers, couriers, enforcers, airplane pilots and ships' crews, wholesalers, retailers, laborers, drivers and look-outs, engaged in repeated transactions over a substantial period of time. It may be clear that the "kingpin" of such an organization is something much more than an "average" participant and that a laborer engaged on a single occasion to load a ship or

plane is something less, but one cannot easily take an "average" of the roles of so many diverse participants.

*United States v. Ruiz*, 246 F.Supp.2d 263, 268 (S.D.N.Y.2002). Surely, "average participant" cannot be equated simply with the defendant whose participation typifies that of most members of the conspiracy. As this case makes clear, a major narcotics conspiracy generally will involve hundreds of participants acting in a variety of roles, most of them quite minor: seamen, guards, stevedores, couriers, transporters, and warehousemen of all sorts. To regard such individuals as "average participants" in the context of a multi-ton cocaine enterprise, simply because the number of them exceeds the number of more significant participants, would be absurd. A pistolero like Aguirre certainly should be deemed more culpable than a rank-and-file courier, but by the same token, substantially less culpable than those who own the drugs, participate directly in profits, give orders, and make significant decisions. *See United States v. Perez*, 321 F.Supp.2d 574, 586, 2003 WL 21018815, at *11 (S.D.N.Y.2003).

■ On the facts here, Aguirre's claim to be a minor participant poses a certain conundrum. On the one hand, in the context of the massive size of this conspiracy – and even of the single 1500 kilogram shipment to which Aguirre has been linked – his participation, in relative terms, could reasonably be described as minor. Compared to other participants, Aguirre's contribution to the success of the venture appears extremely modest and interchangeable with that of many others. The relevant comparison here is not simply of Aguirre's role with that of his codefendants, or even with other participants in this particular conspiracy, which allegedly included players as powerful as the governor of a Mexican state; it rather reflects an appraisal of his role as compared to the general run of participants in multinational narcotics conspiracies of comparable magnitude.

On the other hand, Aguirre participated in the conspiracy as an armed guard, a pistolero. Senior conspirators, like Torres–Teyer, assigned him to defend the drugs, with violence if necessary. Such a role is not easily characterized as insignificant. Nor can it be deemed comparable to that of mere couriers or brute laborers. Moreover, while Aguirre surely was not privy to the deliberations of his superiors, who likely informed him only of the facts he needed to know to perform his limited role as a pistolero, he cannot have been ignorant of the general size and scope of the conspiracy. Aguirre knew that he worked for a vast narcotics distribution enterprise and that the quantities of drugs involved, including the amount he guarded on the day of his apprehension, were enormous.

The evidence therefore permits powerful arguments for treating Aguirre either as a minor or average participant in the conspiracy, and the question of his proper characterization under the Guidelines is a close one. But while the question is close, its answer has dramatic consequences, for whether Aguirre receives a minor role adjustment will drastically affect his sentence. As this Court recently observed, the combination of a base offense level excessively influenced by the quantity of drugs involved in a transaction and the recently-adopted cap for minor or minimal participants creates a "cliff" effect in which this single factor, which involves the application of a poorly-defined, inevitably somewhat subjective standard in a highly fact-specific way, can lead to dramatic changes in the prescribed sentence. *See Perez*, at 582, 2003 WL 21018815, at *7; *cf. United States v. Lauersen*, 362 F.3d 160, 164–65

(2d Cir.2004). Here, the base offense level determined by the quantity of cocaine involved is 38, which corresponds, for first-time offenders, to a sentencing range of 235 to 293 months (a maximum sentence of nearly twenty-five years). Were Aguirre deemed a minor participant, however, his offense level would plummet to 28, for § 2D1.1(a)(3) of the Guidelines establishes a maximum base offense level of 30 "if the defendant receives an adjustment under § 3B1.2 (Mitigating Role)," and Aguirre would then receive a two-level reduction pursuant to § 3B1.2(b). His sentencing range would then be only 78 to 97 months (a minimum sentence of six and one-half years).[11]

Aguirre's personal characteristics weigh in favor of a finding that he played a minor role. Before being recruited into the cocaine trade, Aguirre worked for his entire life as a farmer in Mexico. (Aguirre PSR ¶¶ 56, 59.) He can fairly be described as a peasant, an agrarian worker from a large family bound to the land, with few prospects for legitimate employment in a modern economy. Unquestionably, he knowingly took part in a serious narcotics conspiracy, and he did so as an armed security guard who, it appears, stood ready to use deadly force at least against other drug dealers – though perhaps not against the police; Aguirre offered no resistance when legitimate authorities entered the apartment and seized the drugs. But it is equally unquestionable that Aguirre remained an insignificant cog in the machinery of the drug trade, recruited to serve as one soldier in a virtual army of pistoleros working for Torres–Teyer. To say that he could easily be replaced in the drug trade would be an understatement. Before his extradition, he never set foot in the United States in his life, and indeed, save for his ill-fated expedition to Belize, apparently never left Mexico. Surely no cartel leader had any interest in breaking him out of a Belizean jail. His extradition to the United States seems to have been essentially a tail attached to the larger project of obtaining jurisdiction over his more significant codefendants. He is only an afterthought in this indictment, as expendable to U.S. authorities as he was to leaders of the narcotics conspiracy.

Moreover, the quantity of drugs involved in the overall conspiracy, or even the shipment Aguirre guarded, has little relevance to his culpability. It was presumably a matter of complete indifference to him whether cartel leaders assigned him to guard a shipload, a roomful, a trunkful or a mere handful of cocaine. No doubt, there are perquisites attached to working for a major multinational drug kingpin rather than a minor local trafficker, and this may well justify giving some weight to the size of the conspiracy even for relatively minor participants. But even the seriousness of carrying firearms in furtherance of the narcotics trade – a danger that 18 U.S.C. § 924(c) separately addresses – cannot categorically preclude recognition of the fact that men like Aguirre are interchangeable foot soldiers in drug conspiracies of this size, minor players in the context of the massive scope of the conspiracy and the far more significant roles of other conspirators. It is difficult to believe that the Sentencing Commission had persons like Aguirre in mind when it determined the appropriate base offense level for traffickers in 150 kilograms or more of cocaine. If Aguirre does not qualify for a minor role adjustment, he may well warrant a down-

---

11. Of course, the ultimate sentences in either case would be subject to a variety of other adjustments, and at the low end would be limited by the statutory mandatory minimum sentence of ten years.

ward departure from the sentencing range applicable to level 38 cocaine conspiracies.

It is equally difficult, however, to imagine that the Commission envisioned armed men standing guard over 1500 kilograms of cocaine when it limited the base offense level for minor participants, even in large narcotics conspiracies. By adopting § 2D1.1(a)(3), the Commission recognized the kinds of problems just outlined by offering a reduction to minor players in huge conspiracies. But it is doubtful that in offering that reduction, it considered "minor" participants who may well have engaged in serious misconduct – however minor in relation to that of other participants – in the course of conspiracies of quite this scope. To the extent Aguirre *is* a minor participant, he is certainly not a "heartland" minor participant.

It would be foolish, as well as contrary to Congress's instructions, to attempt to resolve the twin questions of Aguirre's eligibility for a minor role adjustment and whether his circumstances should be deemed so unique as to take him out of the "heartland" of sentences applicable either to minor or average participants without considering the statutory purposes of sentencing. Title 18 U.S.C. § 3553(b)(1) instructs courts to impose "a sentence of the kind, and within the range" established by the Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." At the same time, and at times in tension with that instruction, Congress has directed the courts, in equally mandatory language, to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [§ 3553(a)(2) ]," which sets forth certain goals of sentenc-

ing. 18 U.S.C. § 3553(a). These objectives must be kept in mind in determining whether the Guidelines "adequately take[ ] into consideration" the factors relevant to Aguirre's situation. They also provide some guidance as to whether, in the context of this conspiracy, someone like Aguirre should properly be deemed a minor participant.

A sentence must "reflect the seriousness of the offense, ... promote respect for the law, and ... provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). But how much does the seriousness of the offense here, or its just punishment, depend on the exact amount of cocaine behind the door that Aguirre guarded? Does it "promote respect for the law" to imprison this young man for more than twenty years, based not primarily on his own conduct or the level of payment he received for it, but on the profits his employer earned and the size of the operation? Undoubtedly, a considerably lower sentence would adequately serve these goals. But to impose a sentence of less than ten years on an armed guard in a drug enterprise of monumental proportions would be disproportionately lenient, particularly when viewed in comparison to the penalties imposed on relatively minor street dealers in crack cocaine, whom the Guidelines subject to ten-year sentences for dealing in quantities of drugs of a street value that would not constitute a rounding error in Torres–Teyer's ledger books.

An appropriate sentence must also "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). But whatever the actual deterrent effect of dramatically long sentences on young Americans susceptible to involvement in the narcotics trade, the arm of American law so seldom reaches into foreign countries to capture low-level participants in

drug organizations that the imposition of a twenty-year sentence in such a rare instance can hardly be expected to have much of an effect. Similarly, the enumerated goal of protecting the American "public from further crimes of the defendant," *id.* § 3553(a)(2)(C), has little relevance here. A stiff sentence, particularly when combined with the mandatory five-year consecutive term, will be followed by Aguirre's deportation to Mexico. The American public will receive precious little additional protection in return for the considerable expense of housing him for nearly thirty years. Surely we would do better to sentence him to a briefer term of imprisonment, and then deport him back to his home, where he might conceivably serve as a lesson to other would-be flunkies of narcotics kingpins – rather than sentence him to languish here for decades, forgotten by all but his family, at the American taxpayer's expense.

Taking account of all these considerations, the Court finds that Aguirre should properly be characterized as a minor participant. In view of the sentencing objectives that Congress has instructed the courts to consider, Aguirre's participation in this offense makes him "substantially less culpable than the average participant" in a multinational, multi-ton cocaine importation scheme. U.S.S.G. § 3B1.2, Application Note 3(A).

At the same time, on the facts of this case, the sentence provided by the Guidelines for a minor participant is too low. It does not take into account the size of the conspiracy involved or the potential for violence inherent in Aguirre's role as an armed guard. Even the mandatory minimum sentence of ten years, which would raise Aguirre's sentence well beyond the Guideline sentence for a minor participant, does not adequately account for these factors. By setting a binary punishment choice – a sentence of nearly twenty years for "average" participants, and only about one third of that for "minor" participants – the Sentencing Commission did not adequately consider the unique circumstances of defendants whose roles, in the context of the massive narcotics conspiracies in which they participate, must be described as minor, and yet nonetheless involve serious conduct.

As noted, the Government seeks an upward departure pursuant to U.S.S.G. § 2D1.1, Application Note 16, because the amount of the shipment was 1500 kilograms, some ten times the weight that warrants a base offense level of 38. To the extent that the government seeks a sentence in excess of the sentence provided for non-minor participants in a level 38 conspiracy, its position strikes this Court as excessive, indeed, verging on ridiculous. Whether Aguirre does or does not qualify as a minor participant within the meaning of § 3B1.2(b), he unquestionably can be deemed no more than a trivial figure in this conspiracy and the drug trade generally. No evidence indicates that he acted as anything more than a salaried employee. Nor does any evidence suggest that he knew – or cared – precisely how many kilograms of cocaine Torres–Teyer assigned him to guard. The notion that Aguirre should be punished by a sentence longer than the extravagant one he must serve already, simply because his bosses were major narcotics dealers who imported very large quantities of drugs, cannot be justified by reference to any accepted theory of punishment – and certainly not by the objectives established by Congress in § 3553.

The Sentencing Commission clearly did not design its narcotics table with persons like Aguirre in mind. The structure of the Guidelines makes some sense for domestic narcotics offenders dealing in

the amounts typically encountered. But for low-level operatives of major foreign cartels, that structure is strained to the breaking point. The sheer size of these organizations means, on the one hand, that more people, whose roles might be more significant in a smaller operation, will qualify as minor participants. On the other hand, the magnitude of harm caused by such organizations would make it inappropriate to reduce the sentence of even minor participants in the manner prescribed by the current minor role adjustment. Accordingly, the Court concludes that to the extent that the Guidelines, based on Aguirre's qualification for a minor role adjustment, prescribe a sentence below the mandatory minimum for even a five-kilogram cocaine conspiracy, the facts call for an upward departure. Indeed, even to sentence Aguirre at the mandatory minimum level would unjustly equate him with far less significant players in dramatically less extensive drug conspiracies. The Court therefore intends to depart upward to a level above the ten-year mandatory minimum, but for the reasons set forth above, lower than the level that would apply had Aguirre not qualified for the minor role adjustment. In accordance with Rules 32(i)(1)(C) and 32(i)(4)(A) of the Federal Rules of Criminal Procedure, his exact sentence will be determined after the parties have had an opportunity to be heard.

Alternatively, were Aguirre *not* treated as a minor participant, the offense level of 36 would, for the reasons set forth above, be excessive, for it would fail adequately to take into account that when drug conspiracies reach an extravagant size and scope, some participants, even if not technically minor participants, nonetheless play such limited roles that the quantity of drugs does not provide a fair measure of their culpability. Accordingly, were it to be found that the Court erred by treating Aguirre as a minor participant, the Court would depart *downward* to a sentence of the same level contemplated above, for the same reasons, that is, to effectuate the instructions of Congress to heed the purposes of just sentencing.

Accordingly, the Court finds that (a) Aguirre's offense level for the narcotics conspiracy counts is 26 (28 minus 2 points for acceptance of responsibility); (b) his criminal history category is I; (c) the resulting sentencing range is 63 to 78 months; but (d) a mandatory minimum sentence of 120 months applies. For the reasons set forth above, however, the Court anticipates departing upward from the mandatory minimum. In any event, pursuant to 18 U.S.C. § 924(c)(1)(A), Aguirre will also receive a mandatory 60–month consecutive sentence.

## CONCLUSION

Torres–Teyer will be sentenced on Counts One and Two to a term of imprisonment within the range of 324 to 405 months, and on Count Three to a consecutive 60–month term. Carrasco will be sentenced on Counts One and Two to a term of imprisonment within the range of 235 to 293 months. Aguirre will be sentenced on Counts One and Two to a sentence that represents an upward departure from the guideline/mandatory minimum sentence of 120 months, and on Count Three to a consecutive 60–month term.

SO ORDERED.